[No. D007461. Fourth Dist., Div. One. May 23, 1989.]

MICHAEL HIGGINS, Plaintiff and Appellant, v.
LEO T. MAHER et al., Defendants and Respondents.

COUNSEL

Glen S. Margolis for Plaintiff and Appellant.

McInnis, Fitzgerald, Rees, Sharkey & McIntyre and Dave Carothers for Defendants and Respondents.

OPINION

**FROEHLICH, J.**—Plaintiff Michael Higgins filed a complaint for damages against Leo T. Maher in his capacity as Roman Catholic bishop (Bishop), Maher in his individual capacity, and the Roman Catholic Diocese of San Diego. The general demurrer of all defendants was sustained without leave to amend, the court concluding that the matters embraced by the complaint were ecclesiastical and not within the jurisdiction of civil authority. Plaintiff appeals.

The parties do not disagree respecting the black letter law of civil intrusion into the regulation and administration of affairs involving churches. The free exercise of religion is guaranteed by both the federal and state Constitutions. (U.S. Const., Amend. I; Cal. Const., art I, § 4.) ■ The civil courts will therefore not intrude into the church's governance of "religious" or "ecclesiastical" matters, such as theological controversy, church discipline, ecclesiastical government, or the conformity of members to standards of morality. Recognizing that churches, their congregations and hierarchy exist and function within the civil community, however, it is acknowledged that they are as amenable as other societal entities to rules governing property rights, torts and criminal conduct. (*Watson* v. *Jones* (1872) 80 U.S. 679, 732-733 [20 L.Ed. 666, 677-678].)

The difficulty comes in determining whether a particular dispute is "ecclesiastical" or simply a civil law controversy in which church officials happen to be involved. That is the issue in this case. Plaintiff contends his

several causes of action are garden-variety torts which just happen to involve the Bishop. Defendants assert that the dispute arises from a peculiarly ecclesiastical issue, and that framing the allegations in the terminology of common law torts cannot clothe the civil courts with jurisdiction.

■ In that the court's ruling was on a demurrer, we are limited in our factual assumptions to the plaintiff's complaint. (5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 895, pp. 334-337.) Accepting the allegations of the complaint as true, we summarize the facts alleged as follows: Higgins was, and is, a priest of the Roman Catholic Church. In 1978 he was appointed by Bishop Maher as an administrator of a church in the San Diego Diocese. Over a period of some years he reported financial improprieties in his church, and also in the Bishop's staff, to the Bishop, asking that appropriate remedial steps be taken. No action was taken. In April of 1980 the Bishop confronted Higgins with reports he had received of Higgins's "social misconduct," contained in two letters to the Bishop. Allowed to examine only one of these letters, Higgins determined it was a forgery of which Maher was aware. As a result of these false accusations, Higgins suffered mental and emotional distress.

Higgins attempted to resolve his grievance concerning the false accusations through administrative procedures allowed by canon law, including a communication to the Holy See in Rome. The only result of this effort was a denunciation by Bishop Maher, stating that Higgins's correspondence contained "lies."

In January of 1982 the Bishop without prior warning confronted Higgins in the presence of four other priests and "suspended him A Divinis, Ex Conscientia Bene Informata," the effect of which was to remove Higgins from his church post and responsibilities. This action was improper and violative of canon law because it should have been accomplished confidentially, rather than in the presence of other priests, and Higgins's suspension should have come through the Holy See rather than directly from the Bishop.

In a memorandum authored by the Bishop (the use or publication of which is not alleged) the Bishop stated: "Monsignor Higgins' actions of solicitation . . . on many other occasions, have caused grave scandal. . . . He has frequently solicited people . . . the number is numerous and the scandal has been grave." The Bishop never attempted to learn "Plaintiff's side of the alleged incident." In May of 1985, the parishioner who allegedly had made the complaint of social misconduct signed a statement that Higgins "never once made a pass and shouldn't have his name dragged through the mud on pure speculation."

Thereafter, upon persuasion from the church, Higgins underwent a program of rehabilitation with a therapy-oriented organization within the church called Paracletes. During this treatment Higgins was given various drugs which caused him to become nervous and lose much of his reasoning ability. At one time one of the priests with Paracletes diagnosed him as a degenerative schizophrenic. He was treated with electroshock therapy. Although plaintiff had given no permission to release information about his treatment, someone at Paracletes revealed the information about his shock treatments to priests not associated with Paracletes.

After release from Paracletes Higgins spent time in a diocese in Minnesota, and in September of 1985 obtained a position as chaplain in a church hospital in Illinois. He lost this position, however, because the Superior General of Paracletes, without Higgins's consent, made known to the Illinois authorities Higgins's past treatment. Higgins alleges that the continued publication of his personal psychiatric records was an organized campaign to discredit him and to destroy his ability to obtain employment within the church. Bishop Maher, he alleges, was in communication with Paracletes and aware of the unauthorized release of information.

In 1983 a new code of canon law was published, the effect of which was to abrogate the rules under which Higgins had been suspended in January of 1982. This had the effect automatically of lifting his suspension. In any event, the suspension would have terminated automatically in three years, or at the latest in January of 1985. In April of 1987 Higgins attempted to resume his career as priest in San Diego. He was prevented from doing so, however, by the Judicial Vicar of the San Diego Diocese, who on behalf of Bishop Maher asserted Higgins had been removed as a priest. This new publication of Higgins's suspension was done without adherence to the procedures of canon law, was without prior warning or explanation, and constituted "a new termination of employment." Higgins has appealed this action with the church, exhausting his church remedies, but has been afforded no relief.

In June of 1987, Higgins alleges, in an effort to drive him from the diocese, false statements were published by members of the Bishop's staff to other priests concerning "unfounded social allegations," Higgins's prior treatment at Paracletes, his involvement in one or more assaults in the recent past, and his dangerous tendencies.

Following this detailed history, Higgins's complaint contains causes of action incorporating the history and asserting that various of its facets constitute common law torts. The publication of the details of Higgins's confidential treatment at Paracletes is characterized as an invasion of

privacy. The publication of false accusations of assault and social misconduct is the basis for a cause of action for defamation. In what would appear to be a cause of action in tort rather than contract, the defendants are accused of wrongful termination. In a related and similar cause of action the termination is characterized as a breach of the covenant of good faith and fair dealing. Finally, the church's and Bishop's actions are alleged to constitute the negligent as well as the intentional infliction of emotional distress.

## DISCUSSION

We deal first with the causes of action directly related to termination of Higgins's position as an employee or official of the church. ■ Where a schism has developed within a church, resulting in dispute as to who holds ultimate authority for congregational or corporate decisions, civil courts are unavoidably put to the task of identifying the true or legitimate authority. (*Rosicrucian Fellow* v. *Rosicrucian Etc. Ch.* (1952) 39 Cal.2d 121, 131-135 [245 P.2d 481].) To do otherwise would be to deny "all legal protection to churches and [allow] church disputes to be settled by physical force." (Laycock, *Towards a General Theory of Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy* (1981) 81 Colum. L.Rev. 1373, 1413.) This is true even though the dispute centers around the employment of the preacher. (See, e.g., *Providence Baptist Church* v. *Superior Ct.* (1952) 40 Cal.2d 55, 63-64 [251 P.2d 10].) ■ That problem does not, however, impact this case. Higgins affirmatively asserts that the defendants constitute the official church, and further that he has attempted to utilize and in fact has exhausted his church's judicial and administrative remedies.

In the wrongful termination and breach of implied covenant causes of action, therefore, we start with the assumption of termination by the legally constituted authority of the church, but by a procedure contrary to church law and regulations, and for improper, false and fraudulent motives. Higgins asks us to right these wrongs even as the same would be corrected were his employer not the church, but an ordinary civil entity.

We cannot do this. The authorities are next to unanimous in concluding that civil courts may not involve themselves in reviewing the termination of clergy for theological or disciplinary reasons. In *Maxwell* v. *Brougher* (1950) 99 Cal.App.2d 824 [222 P.2d 910], the issue was the propriety of the church's majority membership's retaining its preacher in the face of charges of malfeasance. Declining to become involved in what the court concluded was an internal church matter, the court stated at page 826: "Where the subject matter of a dispute is purely ecclesiastical in its character, a matter

which concerns church discipline or the conformity of its members to the standard of morals required of them, the decision of the church tribunal will not be interfered with by the secular courts either by reviewing their acts or by directing them to proceed in a certain manner or, in fact, to proceed at all. If the civil courts undertook so to do they would deprive such bodies of their right of construing their own church laws including doctrinal theology and the uses and customs of every religious denomination."

The removal of clergy may, of course, result in disputes over property. Based upon its obligation under civil law to protect property rights, the court in *Providence Baptist Church* v. *Superior Ct., supra,* 40 Cal.2d 55, sanctioned court appointment of a referee to hold an election among church members. "As long as civil or property rights are involved, the courts will entertain jurisdiction of controversies in religious bodies although some ecclesiastical matters are incidentally involved." (*Id.* at p. 60.) However, while undertaking jurisdiction on the ground of protection of property rights, the court approved the rule stated in *Watson* v. *Jones, supra,* 80 U.S. 679, that " 'the supervisory power of the civil tribunals may not be invoked when the only property involved is the loss of clerical office and the salary incident thereto.' " (*Providence Baptist Church* v. *Superior Ct., supra,* 40 Cal.2d 55 at p. 62, quoting *Dyer* v. *Superior Court* (1928) 94 Cal.App. 260 at p. 269 [271 P. 113].)

Instructive in this area are cases dealing with conflicts between the equal employment opportunity requirements of title VII of the Civil Rights Act of 1964 [42 U.S.C. § 2000e et seq.] and rules and policies of the church. *McClure* v. *Salvation Army* (5th Cir. 1972) 460 F.2d 553 involved a plaintiff employed in a religious capacity by the Salvation Army, an entity found by the court to be a "church." (*Id.* at p. 554.) The issue was whether the secular court was precluded from applying the requirements of title VII to the church's alleged wrongful termination of plaintiff. In precluding relief, the court stated: "The relationship between an organized church and its ministers is its lifeblood. The minister is the chief instrument by which the church seeks to fulfill its purpose. Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern. Just as the initial function of selecting a minister is a matter of church administration and government, so are the functions which accompany such a selection. It is unavoidably true that these include the determination of a minister's salary, his place of assignment, and the duty he is to perform in the furtherance of the religious mission of the church." (*McClure* v. *Salvation Army, supra,* at pp. 558-559.)

An attempt to apply title VII rules to the church's employment practices would, the court stated, "involve an investigation and review of these prac-

tices and decisions and would, as a result, cause the State to intrude upon matters of church administration and government which have so many times before been proclaimed to be matters of a singular ecclesiastical concern. Control of strictly ecclesiastical matters could easily pass from the church to the State. The church would then be without the power to decide for itself, free from state interference, matters of church administration and government." (460 F.2d at p. 560.)

The teaching of this line of authority is that secular courts will not attempt to right wrongs related to the hiring, firing, discipline or administration of clergy. Implicit in this statement of the rule is the acknowledgement that such wrongs may exist, that they may be severe, and that the administration of the church itself may be inadequate to provide a remedy. The preservation of the free exercise of religion is deemed so important a principle as to overshadow the inequities which may result from its liberal application. In our society, jealous as it is of separation of church and state, one who enters the clergy forfeits the protection of the civil authorities in terms of job rights. Father Higgins's causes of action for loss of position, for loss of salary and benefits, and for the related personal stress and humiliation the same may have caused, were properly dismissed.

This conclusion does not, however, end our deliberations. While a man of the cloth may give up his civil rights related to employment, Higgins contends it does not follow that he waives recourse for the common law wrongs he may suffer. Commission of a crime, such as murder, will remain a matter for civil authorities regardless of the tenets of a religious organization whose members may perpetrate the offense. (See *Watson* v. *Jones, supra,* 80 U.S. 679 at p. 733 [20 L.Ed.2d 666 at p. 678].) The commission of a common law tort in the name of or under the auspices of a church does not lessen its culpability. (*O'Moore* v. *Driscoll* (1933) 135 Cal.App. 770, 774 [28 P.2d 438]; *Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1114, 1116-1117 [252 Cal.Rptr. 122, 762 P.2d 46]; *Walker* v. *Superior Court* (1988) 47 Cal.3d 112 [252 Cal.Rptr. 122, 762 P.2d 46].) Higgins has pleaded the essential elements of the torts of invasion of privacy, defamation, and the intentional and negligent infliction of emotional distress. His pleading is plain and direct in terms of accusing the Bishop and other church hierarchy of unwarranted and malicious conduct which caused him severe damage. Had these allegations been set forth without the preamble showing their genesis in the priest-bishop relationship, it is doubtful they could have been dismissed on demurrer.

Our perplexity is the result of the extent and detail of Higgins's pleading. We know not only that the Bishop has defamed Higgins, violated his privacy and caused him emotional distress. We know that the acts so taken were

part and parcel of the Bishop's administration of his ecclesiastical functions. We have established, above, that the Bishop is answerable only to canonical authorities for his misdeeds in the wrongful treatment of a priest, in terms of *ecclesiastical* as distinguished from civil spheres. If, as part of procedures resulting in the defrocking of a priest, the Bishop makes false accusations, we restrain the civil authorities from becoming involved. The accusations, false or not, pertain directly to the ecclesiastical functions of the church, and we deign not to become involved. When we *know* that torts such as those of which Higgins complains occurred as inseparable parts of a process of divestiture of priestly authority, we are most reluctant to sever them from the privileged aura of what might be called ecclesiastical exemption.

Regardless of the church's motives or objectives, or the circumstances giving rise, we would probably agree that torts such as battery, false imprisonment or conversion cannot be perpetrated upon its members with civil impunity. We find, however, that at least in the context of Higgins's averments, the torts recited are simply too close to the peculiarly religious aspects of the transaction to be segregated and treated separately—as simple civil wrongs. The making of accusations of misconduct; the discussion of same within the order; the recommendation of psychological or medical treatment; the infliction, whether intentionally or negligently, of emotional distress—these are all activities and results which will often, if not usually, attend the difficult process by which priestly faculties are terminated. If our civil courts enter upon disputes between bishops and priests because of allegations of defamation, mental distress and invasion of privacy, it is difficult to conceive the termination case which could not result in a sustainable lawsuit.

The plaintiff has established that all the defendants are participants in an ecclesiastical undertaking. He avers that the religious order is an established one with recognized structure of authority and judicature. His complaint arises as a result of his employment in this canonical establishment, and the detailed history of his misfortune relates most specifically to the inner workings of his church. Under these circumstances, we hold that the plaintiff cannot, by separate statement and distinct characterization of divisible aspects of the transaction, achieve articulation of common law torts sufficient to overcome our preclusion from meddling in the ecclesiastical authority of the church.

## DISPOSITION

The judgment of the trial court is affirmed.

Todd, Acting P. J., and Huffman, J., concurred.

A petition for a rehearing was denied June 12, 1989, and appellant's petition for review by the Supreme Court was denied August 10, 1989. Kaufman, J., was of the opinion that the petition should be granted.