TIMOTHY THIBODEAU *v.* AMERICAN BAPTIST
CHURCHES OF CONNECTICUT ET AL.
(AC 30260)

Bishop, Beach and Hennessy, Js.

Argued September 24, 2009—officially released April 27, 2010

*Timothy Thibodeau*, pro se, the appellant (plaintiff).

*James F. Sullivan*, for the appellee (named defendant).

*Opinion*

BEACH, J. The first amendment to the constitution of the United States and article first, § 3, of the constitution of Connecticut prohibit the state's involvement in the internal doctrinal matters of religious organizations. The first amendment, however, does not necessarily confer to religious organizations immunity from liability arising from tortious conduct.[1] Though courts may not intervene in or authoritatively decide doctrinal matters, courts necessarily must decide whether, in a given case, abstention is appropriate. Here, the plaintiff, Timothy Thibodeau, appeals from the judgment of the trial court granting the motion to dismiss his complaint for lack

---

[1] The language of article first, § 3, of the constitution of Connecticut may be instructive. That section states: "The exercise and enjoyment of religious profession and worship, without discrimination, shall forever be free to all persons in the state; provided, that the right hereby declared and established, shall not be so construed as to excuse acts of licentiousness, or to justify practices inconsistent with the peace and safety of the state." Conn. Const., art. I, § 3.

of subject matter jurisdiction filed by the defendant American Baptist Churches of Connecticut.[2] The plaintiff claims that the court improperly dismissed his complaint.[3] We disagree and, accordingly, affirm the judgment of the trial court.

The following facts, as alleged by the plaintiff and reasonably garnered from the record, are relevant to our resolution of his appeal. The plaintiff, an ordained Baptist minister, sought employment through the services of the defendant. The defendant is a regional organization of American Baptist congregations. The defendant does not ordain ministers, but it recognizes ordinations performed by member churches. It also provides placement services for ordained ministers.

The plaintiff's involvement with the defendant began in approximately 1977. From 1977 until 1987, the plaintiff was a member of a Baptist church in Ashford, and in 1988, he became a member of Community Baptist Church of Manchester. In 1982, the plaintiff graduated from college, and in 1989, he graduated from Yale Divinity School with a master of divinity degree. In 1990, the plaintiff was ordained by Community Baptist Church of Manchester, a member affiliate of the defendant. His ordination made him eligible for employment opportunities through the defendant. Apparently, the defendant provided a clearinghouse whereby congregations seeking ministers could obtain information about available ministers. Over time, the defendant became concerned about the plaintiff's fitness for the ministry. It decided to "flag" his profile and decided not to circulate it to congregations seeking ministers.

---

[2] Initially, the action also was brought against American Baptist Churches, USA, but the action was later withdrawn with respect to that defendant. We refer in this opinion to American Baptist Churches of Connecticut as the defendant.

[3] Although the plaintiff asserts a violation of our state constitution, he has provided no independent state constitutional analysis. We thus limit our review to the plaintiff's federal constitutional claim.

In May, 2007, the self-represented plaintiff filed a four count, fourth revised complaint, which alleged breach of an implied contract on a theory of promissory estoppel, defamation, "deceit and fraud" and negligent infliction of emotional distress. The defendant moved to dismiss all counts of the plaintiff's complaint for lack of subject matter jurisdiction. The defendant argued that the first amendment to the United States constitution and article first, § 3, of the Connecticut constitution restrict the government's power to intrude into ecclesiastical matters and to interfere with a church's governance of its affairs. The defendant further argued that a court's consideration of the merits of the plaintiff's allegations, as pleaded, would result in an impermissible entanglement of the court in matters related to the defendant's doctrines and internal affairs, such as a minister's qualifications to serve as a minister and to obtain employment as a minister in a religious organization. The court granted the defendant's motion to dismiss. It reasoned that it was "without jurisdiction to determine whether the plaintiff's ordination as a Baptist minister should be recognized by the [defendant] or to review whether he has been treated fairly by the [defendant] with respect to recognition of his ordination." This appeal followed.

On appeal, the plaintiff argues that the court improperly granted the defendant's motion to dismiss for lack of subject matter jurisdiction because his complaint raises only secular issues that do not require a court to interpret religious doctrine or practices. The defendant asserts that in order for a court to consider any of the causes of action alleged in the plaintiff's complaint, it would need to consider competing views of whether the plaintiff was fit to serve as an American Baptist minister, which question necessarily requires an inquiry into the defendant's internal policies, religious doctrine and procedures.

We first set forth our standard of review. "A motion to dismiss tests, inter alia, whether, on the face of the record, the court is without jurisdiction. . . . [O]ur review of the court's ultimate legal conclusion and resulting [determination] of the motion to dismiss will be de novo. . . . When a . . . court decides a jurisdictional question raised by a pretrial motion to dismiss, it must consider the allegations of the complaint in their most favorable light. . . . In this regard, a court must take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader." (Citation omitted; internal quotation marks omitted.) *Bagg* v. *Thompson*, 114 Conn. App. 30, 37–38, 968 A.2d 468 (2009). "A motion to dismiss admits all facts well pleaded and invokes any record that accompanies the motion, including supporting affidavits that contain undisputed facts." (Internal quotation marks omitted.) *Henriquez* v. *Allegre*, 68 Conn. App. 238, 242, 789 A.2d 1142 (2002).[4]

I

The first amendment to the United States constitution, applicable to the states through the fourteenth amendment to the United States constitution; see *Cantwell* v. *Connecticut*, 310 U.S. 296, 303, 60 S. Ct. 900, 84 L. Ed. 1213 (1940); provides in pertinent part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const., amend. I. A brief overview of the religion clauses of the first amendment as they are applicable to the present case may be helpful.[5] "The first amendment to the United States constitution protects religious

[4] Although both parties submitted documents to the court for its consideration of the motion to dismiss, the few facts found by the court appear to be based primarily on the allegations of the complaint.

[5] "Because no Connecticut appellate court has determined the extent to which the first amendment provides protection to religious entities and officials from [contract and] tort liability on facts similar to those involved in this case, we examine the opinions of the United States Supreme Court

institutions from governmental interference with their free exercise of religion." *Rweyemamu* v. *Commission on Human Rights & Opportunities*, 98 Conn. App. 646, 648, 911 A.2d 319 (2006), cert. denied, 281 Conn. 911, 916 A.2d 51, cert. denied, 552 U.S. 886, 128 S. Ct. 206, 169 L. Ed. 2d 144 (2007).

"[T]he first amendment has been interpreted broadly to severely [circumscribe] the role that civil courts may play in resolving . . . disputes concerning issues of religious doctrine and practice." (Internal quotation marks omitted.) *DeCorso* v. *Watchtower Bible & Tract Society of New York, Inc.*, 78 Conn. App. 865, 875–76, 829 A.2d 38, cert. denied, 266 Conn. 931, 837 A.2d 805 (2003). "Under both the free exercise clause and the establishment clause, the first amendment prohibits civil courts from resolving disputed issues of religious doctrine and practice." Id., 880. By contrast, exercise of governmental authority is permissible if it (1) has a secular purpose, (2) neither inhibits nor advances religion as its primary effect and (3) does not create excessive entanglement between church and state. *Lemon* v. *Kurtzman*, 403 U.S. 602, 612–13, 91 S. Ct. 2105, 29 L. Ed. 2d 745 (1971). "Under 'excessive entanglement' analysis, civil tort claims requiring courts to review and to interpret religious doctrine and practices are barred by the first amendment." *DeCorso* v. *Watchtower Bible & Tract Society of New York, Inc.*, supra, 877; see also *Serbian Eastern Orthodox Diocese* v. *Milivojevich*, 426 U.S. 696, 721–23, 96 S. Ct. 2372, 49 L. Ed. 2d 151 (1976) (holding that first amendment barred judicial consideration of bishop's wrongful discharge claim).

Freedom of religion is guaranteed not only to individuals but also to churches, and church organizations,

and courts of other jurisdictions that have considered similar issues for our resolution of this case." *DeCorso* v. *Watchtower Bible & Tract Society of New York, Inc.*, 78 Conn. App. 865, 876, 829 A.2d 38, cert. denied, 266 Conn. 931, 837 A.2d 805 (2003).

which have "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff* v. *St. Nicholas Cathedral*, 344 U.S. 94, 116, 73 S. Ct. 143, 97 L. Ed. 120 (1952). In the nineteenth century, the United States Supreme Court enunciated principles limiting the role of civil courts in resolving religious controversies. In 1871, prior to "judicial recognition of the coercive power of the [f]ourteenth [a]mendment to protect the limitations of the [f]irst [a]mendment against state action;" id., 115; the Supreme Court in *Watson* v. *Jones*, 80 U.S. (13 Wall.) 679, 727, 20 L. Ed. 666 (1871), held that "the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority is, that, whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." At least since then, the Supreme Court consistently has held that civil courts are prohibited by the first amendment from adjudicating disputes turning on church policy and administration or on religious doctrine and practice.[6] See *Serbian Eastern Orthodox Diocese* v. *Milivojevich*, supra, 426 U.S. 708–709; *Presbyterian Church in the United States* v. *Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 446–

---

[6] Although the Supreme Court in *Watson* v. *Jones*, supra, 80 U.S. 679, proscribed judicial review of purely ecclesiastical decisions, in *Presbyterian Church in the United States* v. *Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 447, 89 S. Ct. 601, 21 L. Ed. 2d 658 (1969), the court discussed the possibility of "marginal civil court review" of such disputes. Prior to that, in *Gonzalez* v. *Roman Catholic Archbishop*, 280 U.S. 1, 16, 50 S. Ct. 5, 74 L. Ed. 131 (1929), the court stated: "In the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals

47, 89 S. Ct. 601, 21 L. Ed. 2d 658 (1969); *Kedroff* v. *St. Nicholas Cathedral*, supra, 114–16; *Gonzalez* v. *Roman Catholic Archbishop*, 280 U.S. 1, 16, 50 S. Ct. 5, 74 L. Ed. 131 (1929). In short, "[as a] general rule . . . religious controversies are not the proper subject of civil court inquiry, and . . . a civil court must accept the ecclesiastical decisions of church tribunals as it finds them." *Serbian Eastern Orthodox Diocese* v. *Milivojevich*, supra, 713.

The constitution, however, does not immunize every church action from juridical review. "[N]ot every civil court decision . . . jeopardizes values protected by the [f]irst [a]mendment." *Presbyterian Church in the United States* v. *Mary Elizabeth Blue Hull Memorial Presbyterian Church*, supra, 393 U.S. 449. "[C]hurches, their congregations and hierarchy exist and function within the civil community. . . [and] it is acknowledged that they are as amenable as other societal entities to rules governing property rights, torts and criminal conduct." *Higgins* v. *Maher*, 210 Cal. App. 3d 1168, 1170, 258 Cal. Rptr. 757, review denied, 1989 Cal. LEXIS 4082 (August 10, 1989), cert. denied, 493 U.S. 1080, 110 S. Ct. 1135, 107 L. Ed. 2d 1040 (1990), citing *Watson* v. *Jones*, supra, 80 U.S. 732–33. If a court can resolve the dispute by applying only neutral principles of law, however, judicial review may be permissible.

on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise."

Later, in *Serbian Eastern Orthodox Diocese* v. *Milivojevich*, supra, 426 U.S. 712–13, the court announced that the fraud, collusion or arbitrariness exception was dictum only and that "whether or not there is room for 'marginal civil court review' under the narrow rubrics of 'fraud' or 'collusion' when church tribunals act in bad faith for secular purposes, no 'arbitrariness' exception—in the sense of an inquiry whether the decisions of the highest ecclesiastical tribunal of a hierarchical church complied with church laws and regulations—is consistent with the constitutional mandate that civil courts are bound to accept the decisions of the highest judicatories of a religious organization of a hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law."

See *Jones* v. *Wolf*, 443 U.S. 595, 602, 99 S. Ct. 3020, 61 L. Ed. 2d 775 (1979) (applying neutral principles of law analysis to church property dispute); *New York Annual Conference* v. *Fisher*, 182 Conn. 272, 281, 438 A.2d 62 (1980) ("[i]t is now well established that state judicial intervention is justified when it can be accomplished by resort to neutral principles of law . . . that eschew consideration of doctrinal matters such as the ritual and liturgy of worship or the tenets of faith"); see also D. Wiesen, "Following the Lead of Defamation: A Definitional Balancing Approach to Religious Torts," 105 Yale L.J. 291 (1995).

Courts have considered it constitutionally appropriate to resolve cases using neutral principles of law so long as they do not implicate or are not informed by religious doctrine or practice. Courts have properly resolved property disputes; see, e.g., *Presbyterian Church in the United States* v. *Mary Elizabeth Blue Hull Memorial Presbyterian Church*, supra, 393 U.S. 449; so long as the disputes may be resolved by the application of ordinary principles of property law and without resort to ecclesiastical matters. See *Jones* v. *Wolf*, supra, 443 U.S. 595; *Maryland & Virginia Eldership of the Churches of God* v. *Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 90 S. Ct. 499, 24 L. Ed. 2d 582 (1970). Similarly, contractual matters, including employment disputes, may be resolved by the secular judicial system in other than religious contexts. Thus, ordinary business contracts may be litigated civilly, as may employment disputes with secular employees. E.g., *Watson* v. *Jones*, supra, 80 U.S. 679; *Equal Employment Opportunity Commission* v. *Pacific Press Publishing Assn.*, 676 F.2d 1272 (9th Cir. 1982); see generally *Heard* v. *Johnson*, 810 A.2d 871, 879–81 (D.C. 2002). But the exception in cases where neutral principles of law may apply ought not swallow the first amendment rule: where conduct is prima facie protected by the first

amendment, a party seeking secular court jurisdiction bears a burden to show that the controversy in issue is outside the constitutional bar. See *Bible Way Church of Our Lord Jesus Christ of the Apostolic Faith* v. *Beards*, 680 A.2d 419, 430 (D.C. 1996), cert. denied, 520 U.S. 1155, 117 S. Ct. 1335, 137 L. Ed. 2d 494 (1997); see also *Heard* v. *Johnson*, supra, 881–82.

## II

In this case, each claim in the plaintiff's complaint arises out of his relationship with the defendant, a religious organization.[7] The gravamen of each of the plaintiff's claims is that the defendant did not assist him in obtaining employment as an ordained minister but rather harmed him by withdrawing its recognition of his ordination. The central question presented is whether the disputes require the court to interpret and to apply religious doctrine and practices or whether the dispute is simply a controversy that involves church officials but to which neutral principles of secular law can be applied without need to inquire into ecclesiastical matters. On a reading of the complaint, it is apparent that the plaintiff's claims arise primarily from the defendant's decision to withdraw its recognition of the plaintiff's ordination and to refuse to circulate his resume to churches. We will examine each claim in turn.

## A

In his promissory estoppel count,[8] the plaintiff appears to allege that the defendant made statements

[7] The plaintiff argues, essentially, that because he was not employed by the defendant, his claims do not implicate the defendant's right to autonomy in making decisions regarding its affairs, including matters of faith, doctrine and internal governance. The plaintiff cannot prevail on this argument. The plaintiff is seeking employment opportunities as a minister through the defendant. To the extent that the resolution of the plaintiff's claims would require the finder of fact to inquire into matters of church doctrine and governance, his claims are barred by the first amendment.

[8] The plaintiff entitled this count "breach of a promissory estoppel of an implied contract." "The difference between a contract claim and a promissory estoppel claim is merely that in one instance a court enforces a promise

to him concerning the steps he needed to take in order to become eligible for employment opportunities provided by the defendant. In reliance on the defendant's statements, the plaintiff changed his position by obtaining a bachelor's degree and a master of divinity degree, and by fulfilling various other preemployment requirements such as becoming ordained and serving as an intern at an American Baptist church. The plaintiff contends that he was qualified for employment opportunities and that the defendant should have circulated his resume to churches. He alleges that the defendant "blacklisted" him from employment opportunities because of "criticisms against his character, appearance, style, and theological perceptions." He alleges that he remained underemployed or unemployed in secular employment because, inter alia, he was not qualified for employment other than that for which he had been specially trained.

"Under the law of contract, a promise is generally not enforceable unless it is supported by consideration. . . . This court has recognized, however, the development of liability in contract for action induced by reliance upon a promise, despite the absence of common-law consideration normally required to bind a promisor . . . . Section 90 of the Restatement [(Second) of Contracts] states that under the doctrine of promissory estoppel [a] promise which the promisor should reasonably expect to induce action or forbearance on the part

because it was part of a bargain, and in the other a court enforces a promise because it induced unbargained-for reliance." (Internal quotation marks omitted.) *Perricone* v. *Perricone*, 292 Conn. 187, 201 n.10, 972 A.2d 666 (2009). This count does not appear to be based on breach of an implied in fact contract, which is the same as an express contract except that assent is implied from the conduct of the parties, or an implied in law contract, which is not a contract but another name for unjust enrichment. See *Vertex, Inc.* v. *Waterbury*, 278 Conn. 557, 573–74, 898 A.2d 178 (2006). Rather, this count appears to be based on promissory estoppel. See *Cahill* v. *Board of Education*, 198 Conn. 229, 236, 502 A.2d 410 (1985) (interpretation of pleadings question of law).

of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. [1 Restatement (Second), Contracts § 90, p. 242 (1981).] A fundamental element of promissory estoppel, therefore, is the existence of a clear and definite promise which a promisor could reasonably have expected to induce reliance. Thus, a promisor is not liable to a promisee who has relied on a promise if, judged by an objective standard, he had no reason to expect any reliance at all." (Internal quotation marks omitted.) *Stewart* v. *Cendant Mobility Services Corp.*, 267 Conn. 96, 104–105, 837 A.2d 736 (2003).

Actions based on contract law centering on employment disputes between clergy and religious institutions can be litigated in civil courts only if neutral principles of law can be applied without entanglement with religious considerations. A church may make enforceable promises. See, e.g., *Watson* v. *Jones*, supra, 80 U.S. 714. Courts, however, may not inquire into matters whose enforcement would require "a searching and therefore impermissible inquiry" into church doctrine. *Serbian Eastern Orthodox Diocese* v. *Milivojevich*, supra, 426 U.S. 723.

In this case, the plaintiff's claim centers around a dispute involving the defendant's selection of candidates whom it will assist in obtaining ecclesiastical employment. The plaintiff contends that he satisfied the requirements set forth by the defendant and therefore was qualified to have the defendant assist him in obtaining ecclesiastical employment. He contends, however, that the defendant "blacklisted" him based on, inter alia, his theological perceptions. Resolution of this claim would involve an impermissible inquiry into the defendant's internal procedures and its judgment regarding the qualifications of clergy, as well as the plaintiff's objective qualifications for employment

opportunities through the defendant. The reasonableness of alleged promises and reliance thereon cannot be decided without inquiry into such matters. The first amendment precludes governmental interference with the selection of clergy. *Kedroff* v. *St. Nicholas Cathedral*, supra, 344 U.S. 116; see also *Gonzalez* v. *Roman Catholic Archbishop*, supra, 280 U.S. 16 ("[decisions of church authorities concerning] what the essential qualifications of [clergy] are and whether the candidate possesses them . . . although affecting civil rights, are accepted in litigation before the secular courts as conclusive").

B

In the defamation count, the plaintiff alleges that the defendant, through its executive minister and other officials, published letters within the church community that contained various false statements, including statements that the deaconate of Community Baptist Church of Manchester recommended that the plaintiff's ordination be postponed, that the plaintiff was no longer engaging in the fellowship and ministry of the church but rather was pursuing solo street ministry, and that the plaintiff's profile should not be circulated to churches affiliated with the defendant. These statements, the plaintiff contends, "blacklisted him from potential employment opportunities with any churches associated with [the defendant]."

"To establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Cweklinsky* v. *Mobil Chemical*

*Co.*, 267 Conn. 210, 217, 837 A.2d 759 (2004). Truth is a defense to defamation. Id., 228–29.[9]

The plaintiff's defamation count, as previously noted, concerns letters published by members of the defendant within the church community containing allegedly false statements about the plaintiff with respect to his fitness for ministry. This claim arises out of the defendant's relationship with the plaintiff, and its resolution would require an impermissible inquiry into the defendant's bases for its action and its ground for evaluating ministers. See *Heard* v. *Johnson,* supra, 810 A.2d 871 (pastor's defamation claim arising out of employment dispute with church dismissed) and cases cited therein; see also *Stepek* v. *Doe,* 392 Ill. App. 3d 739, 910 N.E.2d 655 (court precluded on first amendment grounds from exercising jurisdiction over matter concerning allegedly defamatory statements published exclusively within context of church's disciplinary proceedings), appeal denied, 233 Ill. 2d 600, 919 N.E.2d 366 (2009).

An examination of *Stepek* and *Heard* may be useful because these cases illustrate considerations pertinent to the present case. In *Stepek,* the plaintiff priest brought a defamation action against two men who had stated in the course of disciplinary proceedings within the hierarchy of the Roman Catholic Church that the plaintiff had sexually abused them. Seeking contribution and indemnity, the two defendants impleaded the Roman Catholic bishop of Chicago. The bishop sought to dismiss the action on the ground that the court lacked subject matter jurisdiction. According to the bishop, the action was foreclosed by application of the doctrine of " 'ecclesiastical abstention' or 'church autonomy'."

[9] If ecclesiastical decisions regarding qualification of clergy are conclusive on civil courts; see part II A of this opinion; and therefore deemed to be true, then a defamation claim brought against a religious organization regarding qualifications for the ministry would appear to be untenable in any event.

Id., 746. The bishop argued that the church had the right under the free exercise clause of the first amendment to govern its own clergy without interference from secular courts. Id.

The Illinois Appellate Court agreed with the bishop. After citing voluminous authority for the proposition that civil courts must accept as conclusive the decisions of ecclesiastical tribunals, the court distinguished suits against priests and church organizations alleging sexual abuse. Those cases allowed inquiry in Illinois, because those issues could be decided without considering church doctrine.[10] Id., 748. The court examined several other cases in which defamation had been alleged by clergy. In one such case, *Hiles* v. *Episcopal Diocese of Massachusetts*, 437 Mass. 505, 773 N.E.2d 929 (2002), an Episcopal priest had been accused by a parishioner of an improper sexual relationship, and the priest alleged that the accusation was false. Because the allegedly defamatory material was published solely in the context of an internal disciplinary proceeding, it had absolute first amendment protection. The *Stepek* court also examined *Callahan* v. *First Congregational Church of Haverhill*, 441 Mass. 699, 808 N.E.2d 301 (2004), in which the plaintiff minister was suspended by church authorities. The *Callahan* court concluded that the plaintiff minister's defamation claims against the church and its officers could not be pursued in the civil forum "to the extent that they arose from the ecclesiastical complaint, investigation, and church committee decision regarding Callahan." *Stepek* v. *Doe*, supra, 392 Ill. App. 3d. 751, citing *Callahan* v. *First Congregational Church of Haverhill*, supra, 715–16. The *Stepek* court noted that "[t]he free exercise clause

---

[10] The United States Supreme Court has recognized an exception: state interference is allowed when the activity "pose[s] some substantial threat to public safety, peace or order." *Sherbert* v. *Verner*, 374 U.S. 398, 403, 83 S. Ct. 1790, 10 L. Ed. 2d 965 (1963).

of the first amendment prohibited the trial court from exercising subject matter jurisdiction over Callahan's claims for discrimination, breach of contract, tortious interference, intentional infliction of emotional distress and violation of right to privacy where the court could not have inquired into the reasons for the church's decisions regarding Callahan's ministry without intruding into matters of internal management of the church." *Stepek* v. *Doe*, supra, 750–51. After reviewing case law, the *Stepek* court concluded that it did not have subject matter jurisdiction over the dispute before it even if the defamation action could be determined by the application of neutral principles of law because the determination would intrude on internal religious affairs of the church. Id., 754–56.

*Heard* v. *Johnson*, supra, 810 A.2d 871, is similar in many ways to this dispute. In *Heard*, a Baptist congregation terminated the services of the plaintiff minister. The minister then brought an action against trustees representing the congregation. The action alleged defamation, invasion of privacy, breach of employment contract, intentional infliction of emotional distress and negligent infliction of emotional distress. The trial court dismissed the action as to the breach of contract and negligent infliction of emotional distress claims but declined to dismiss—or, in the alternative, to grant the trustees' summary judgment motion as to—the remaining claims. The trustees appealed. Id., 875–76.

The District of Columbia Court of Appeals discussed the rubric of first amendment abstention, including the proposition that secular courts may decide issues amenable to resolution by application of neutral principles of law, at least where property disputes and secular employment and business contracts are at issue; the court noted that the " 'fraud, collusion or arbitrariness' " exception enunciated as dictum in *Gonzalez* v. *Roman Catholic Archbishop*, supra, 280 U.S. 16, had

been narrowed almost beyond recognition by the later case of *Serbian Eastern Orthodox Diocese* v. *Milivojevich*, supra, 426 U.S. 696. *Heard* v. *Johnson*, supra, 810 A.2d 881–82. Citing, inter alia, *Serbian Eastern Orthodox Diocese*, the court stated that the first amendment generally prohibits "judicial encroachment into church decisions where those decisions turn on church policy or on religious doctrine or practice. Except for contractual disputes, this prohibition includes church decisions concerning the employment of ministers because selection and termination of clergy is a core matter of ecclesiastical self-governance not subject to interference by a state." *Heard* v. *Johnson*, supra, 882.

The *Heard* court allowed that not all church activities are protected from judicial inquiry: where "important state interests" are at stake, a " 'delicate balancing' " is required. Id., 883. Citing *Wisconsin* v. *Yoder*, 406 U.S. 205, 215, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972), the court stated that only those state interests that are " 'of the highest order'," however, can outweigh legitimate claims to free exercise of religion. *Heard* v. *Johnson*, supra, 810 A.2d 883. Most civil rights and common-law claims are not sufficient to overcome first amendment protection. "Under most circumstances, defamation is one of those common law claims that is not compelling enough to overcome [f]irst [a]mendment protection surrounding a church's choice of pastoral leader." Id. Two points are important: in most of the cases the *Heard* court analyzed, the conflicts were confined to the churches involved, and, critically, the defamation claims typically could not be considered in isolation from the decisions to terminate employment. " 'Questions of truth, falsity, malice, and the various privileges that exist often take on a different hue when examined in the light of religious precepts and procedures that generally permeate controversies over who is fit to represent and speak for the church.' *Downs* [v. *Roman*

*Catholic Archbishop of Baltimore,* 111 Md. App. 616, 624, 683 A.2d 808 (1996)]. Examining such controversies is precisely the kind of inquiry that is forbidden to civil courts since '[w]hose voice speaks for the church is per se a religious matter.' *Minker* [v. *Baltimore Annual Conference of United Methodist Church,* 894 F.2d 1354, 1357 (D.C. Cir. 1990)]." *Heard* v. *Johnson,* supra, 884.

The *Heard* court concluded that the defamation claim was barred by the first amendment because the claim arose from an employment dispute that could not be resolved in isolation from the employment decision as to the pastor, the publication was internal and there were no egregious circumstances. Because the narrow tort claims in issue could not practically be considered in isolation from the entire context, and the context was ordinarily forbidden territory for civil courts, the court directed that the complaint be dismissed in its entirety. Id., 885–87. After carefully analyzing the law and the complaint in the context of defamation at some length, the *Heard* court concluded in a footnote that "three of [the plaintiff's] claims remain, but only as alternative theories of liability. Any argument for or against allowing the defamation claim [to remain] would apply equally well to invasion of privacy . . . or intentional infliction of emotional distress since all three are nonphysical intentional torts. For the sake of convenience and simplicity, we will discuss only defamation in this context. The result we reach as to the defamation claim, however, will dispose of the alternate theories of liability as well." Id., 880 n.5.

We are persuaded that the considerations of the previously discussed cases are pertinent to the disposition of the defamation claim in this case. Simply put, the gravamen of the dispute is the decision of the defendant, a religious organization, not to recommend the plaintiff for a position in the ministry. The defamation claim cannot be entertained in isolation from the dispute over

fitness for the clergy, and there is no overwhelming counterbalancing consideration. The defamation claim was appropriately dismissed.

## C

In his complaint, the plaintiff also alleges "deceit and fraud." This count of the complaint incorporates by reference the facts alleged in the preceding counts. In this count, the plaintiff also alleges that the defendant "concealed and misrepresented facts, which were known to the [defendant], with the intent to mislead the plaintiff and prospective employers of the plaintiff, whose reliance upon the facts led to the plaintiff's detriment." The plaintiff further alleges, inter alia, that "[t]he [defendant] committed fraud in that [it] wantonly and [wilfully] made false representations with the intent to injure and deprive the plaintiff of employment opportunities to his detriment, and with the intent to induce the churches nationally to act to the detriment of the [plaintiff] in one or more of the following ways: (a) [p]revent his resume from circulation; (b) [p]revent interviews with potential employers."

We have examined the complaint at length. It is somewhat unclear from the complaint precisely what cause of action the plaintiff is alleging. Any lack of clarity regarding this count notwithstanding, at the center of this count, however, is the plaintiff's claim that he was harmed by the defendant's failure to circulate his resume and failure to assist him in procuring interviews for pastorate positions at churches affiliated with the defendant. "Generally, courts will not interfere in canonical or ecclesiastical controversies regarding clergymen's employment at a church. The selection or assignment of clergy, and the removal, termination, or suspension of a pastor or clergy member are generally ecclesiastical matters with which civil courts cannot interfere." 77 C.J.S. 112, Religious Societies § 128

(2006). The defendant's decision not to circulate the plaintiff's resume or assist the plaintiff in procuring employment is an ecclesiastical decision over which we do not have jurisdiction. See *Kedroff* v. *St. Nicholas Cathedral*, supra, 344 U.S. 116 (right to choose ministers without government restriction).

## D

The claim of negligent infliction of emotional distress concerns allegations that the defendant caused the plaintiff distress by informing his wife that he would not preach in an American Baptist church because he was affiliated with a cult, by hiring a detective to follow the plaintiff during worship services in the sanctuary and after worship services, by sending a letter to members of the defendant, advising them not to approach the plaintiff and by having a police officer deliver a letter to the plaintiff's home.

"[I]n order to state . . . a claim [for negligent infliction of emotional distress], the plaintiff has the burden of pleading that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that [that] distress, if it were caused, might result in illness or bodily harm." (Internal quotation marks omitted.) *Parsons* v. *United Technologies Corp.*, 243 Conn. 66, 88, 700 A.2d 655 (1997).

The claims alleging infliction of emotional distress are governed, as noted in part II B of this opinion, by the same considerations as those governing the defamation claim. If the claims cannot be resolved without reference to constitutionally protected activity, if the underlying factual circumstances are not especially egregious, if they do not involve public safety, peace or order, and, in short, if no strong state interest outweighs the constitutional value of free exercise of religion,[11] then a civil court may not entertain the claim.

---

[11] In the defamation context, internal publication was a consideration. In this claim of infliction of emotional distress, the alleged emotional distress was inflicted on the plaintiff himself.

Because each of the claims alleging emotional distress cannot be fully resolved without a consideration of the underlying dispute as to fitness and are merely ancillary to the underlying claim, we affirm the court's order dismissing the count.

To determine whether the defendant should have realized that its conduct involved an *unreasonable* risk of causing emotional distress, a court necessarily would review the history and context of and motivations for the defendant's actions. A threshold inquiry is whether the resolution of a claim will project the fact finder into what the Supreme Court, in *Serbian Eastern Orthodox Diocese* v. *Milivojevich,* supra, 426 U.S. 719, aptly called a "religious thicket . . . ." Resolution of the allegation concerning the defendant's informing the plaintiff's wife that the plaintiff would not preach in an American Baptist church because he was affiliated with a cult would delve into the defendant's decision not to assist the plaintiff with employment opportunities, which, at least in this allegation, was allegedly due to the plaintiff's involvement in a cult. The determination of whether informing a church member that another is involved in a cult would cause an unreasonable risk of causing emotional distress would place a court in a position of deciding what a cult is and what its implications are regarding fitness for the ministry. Such a determination would lead a court into a religious thicket. The plaintiff's remaining allegations in his negligent infliction of emotional distress claim present a somewhat closer question. These allegations include hiring a detective to follow the plaintiff during worship services in the sanctuary and after worship services, sending a letter to members of the defendant not to approach the plaintiff and having a police officer deliver a letter to the plaintiff's home. These allegations focus on the conduct of the defendant prior to reaching its decision regarding

the plaintiff's ordination and employment opportunities. The harm the plaintiff claims he suffered as a result of the defendant's conduct is a consequence of the steps taken by the defendant to investigate the employment related dispute between the parties, which dispute is at the center of the plaintiff's complaint. The free exercise clause bars court involvement in the employment relationship between a minister and a church. See, e.g., *Gonzalez* v. *Roman Catholic Archbishop*, supra, 280 U.S. 16 ("it is the function of the church authorities to determine what the essential qualifications of a chaplain are and whether the candidate possesses them"); see also *Serbian Eastern Orthodox Diocese* v. *Milivojevich*, supra, 426 U.S. 717 ("questions of church discipline and the composition of the church hierarchy are at the core of ecclesiastical concern"); *DeCorso* v. *Watchtower Bible & Tract Society of New York, Inc.*, supra, 78 Conn. App. 879.

In the context of this case, the plaintiff's claims are simply too closely related to the ecclesiastical functions of the church and the religious aspects of the plaintiff's relationship with the defendant to be treated as simple civil wrongs able to be addressed solely by neutral secular principles of law without consideration of areas protected from inquiry by the first amendment. His claims are related to issues of church procedure and, as such, adjudication of his claims would require inquiry into the defendant's methods of investigating fitness for the ministry, its reasons for declining to recognize the plaintiff's ordination and its failure to assist him in obtaining employment with churches affiliated with the defendant. "[I]t is the essence of religious faith that ecclesiastical decisions are reached and are to be accepted as matters of faith whether or not rational or measurable by objective criteria." *Serbian Eastern Orthodox Diocese* v. *Milivojevich*, supra, 426 U.S. 714–15. The plaintiff's claims are sufficiently intertwined

with church polity so that resolution by the courts constitutes a threat of entanglement with religious doctrine or practice. Courts generally refrain from considering claims that require "a searching and therefore impermissible inquiry" into church governance. Id., 723. Given this context, it is difficult to see how an inquiry into the policy and procedure of the defendant could be avoided. Even if the plaintiff's claim of negligent infliction of emotional distress could be determined by the application of neutral principles of law, such a determination would intrude on the religious affairs of the church and therefore be barred by the first amendment. See, e.g., *Stepek* v. *Doe*, supra, 392 Ill. App. 3d 754–56. Additionally, there are no state interests involved here that are compelling enough to overcome first amendment protection surrounding the employment relationship between a minister and a church. See, e.g., *Heard* v. *Johnson*, supra, 810 A.2d 882.

Even though the plaintiff's negligent infliction of emotional distress claim concerns the defendant's selection of which clergy members it will assist in obtaining employment, and thus involves an ecclesiastical decision, "[it] is not totally free from legislative restrictions." (Internal quotation marks omitted.) *Sherbert* v. *Verner*, 374 U.S. 398, 403, 83 S. Ct. 1790, 10 L. Ed. 2d 965 (1963). State restriction is permitted when the religious activity "pose[s] some substantial threat to public safety, peace or order." Id. "For example, a church could not select its ministers on the basis of their demonstrated willingness to commit a crime, or by forcing the candidates to play a game of Russian roulette and hiring whoever survived." *Heard* v. *Johnson*, supra, 810 A.2d 883. The trial court did not rely on such exception, and the exception does not appear to apply in this case. The defendant's alleged actions of having someone follow and observe the plaintiff in the sanctuary, instructing church members not to approach the plaintiff and having a

letter delivered to the plaintiff's home by a state officer are not acts that pose a substantial threat to public safety, peace or order.

### III

In sum, this case implicates the ability of the defendant to operate within its own sphere, according to its own methods, and without judicial interference as to its employment recommendations for one of its ministers. The conduct complained of occurred in the context of, or was germane to, a dispute over the plaintiff's fitness or suitability for his ordination to continue to be recognized and whether his resume should be circulated to churches associated with the defendant. If a court were to decide the issues raised in his complaint, it would necessarily inquire into the defendant's decisions regarding its internal management and decisions as to whether a person is suited for the clergy. If a reviewing court did not agree with the procedure used and the effects therefrom in holding the defendant liable, the court would be imposing secular law and disciplinary action on church practice and procedure. "If members of religious organizations could freely pursue their doctrinal grievances in civil courts, or legislatures could pass laws to inhibit or enhance religious activities, ecclesiastical liberty would be subjected to governmental interference and the unmolested and unobstructed development of opinion and belief which the [f]irst [a]mendment shield was designed to foster could be secularly undermined." (Internal quotation marks omitted.) *Guinn* v. *Church of Christ,* 775 P.2d 766, 772 (Okla. 1989). The right to choose ministers without government restriction underlies the well-being of the religious community. See *Kedroff* v. *St. Nicholas Cathedral,* supra, 344 U.S. 116.

The judgment is affirmed.

In this opinion the other judges concurred.