COLIN E. HARLEY *v.* THE INDIAN SPRING
LAND COMPANY
(AC 30022)
(AC 30163)

Flynn, C. J., and Harper and West, Js.*

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

123

Argued January 5—officially released September 21, 2010

*Michael S. Taylor*, with whom were *Wesley W. Horton* and, on the brief, *Gary S. Klein* and *Stephanie A. McLaughlin*, for the appellant (defendant).

*Barry C. Hawkins*, with whom, on the brief, was *Laurie A. Sullivan*, for the appellee (plaintiff).

*Opinion*

WEST, J. The issues we confront in this appeal stem from a reservation agreement executed between the defendant, the Indian Spring Land Company, and the plaintiff, Colin E. Harley. The defendant appeals from the judgment of the trial court, rendered after a trial to the court, in favor of the plaintiff on claims of breach of contract, promissory estoppel[1] and violations of the Connecticut Unfair Trade Practices Act (CUTPA); General Statutes § 42-110a et seq.; as well as the Common Interest Ownership Act (CIOA); General Statutes § 47-200 et seq. On appeal, the defendant claims that the court, for several reasons, improperly concluded that there was a valid oral modification to the reservation agreement. The defendant also claims that even if there was a valid oral modification to the reservation agreement, the court improperly applied the doctrine of equitable estoppel to bar the defendant from asserting the statute of frauds[2] as a defense. Next, the defendant claims that the court improperly found a violation of CUTPA because the evidence adduced at trial did not support a finding of unscrupulous and unethical conduct. The defendant claims that the court improperly found violations of CIOA and the implied duty of good faith and fair dealing because the evidence adduced at trial did not support a finding of bad faith

---

[1] See part I of this opinion.

[2] General Statutes § 52-550 (a) provides in relevant part: "No civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged . . . (4) upon any agreement for the sale of real property or any interest in or concerning real property . . . ."

on the defendant's part. Last, the defendant claims that the court improperly awarded damages. We affirm in part and vacate in part the judgment of the trial court.

The record contains the following facts and procedural history that provides the backdrop for our resolution of the issues on appeal. The defendant was formed as a land holding company in 1912 and has held large tracts of land in Greenwich for investment purposes since that time. In 1996, the defendant started the subdivision approval process in order to develop for residential use approximately seventy-nine acres of that land. The defendant named the common interest community Sherwood Farm and, in 2000, commenced selling building lots. In the spring of 2004, the plaintiff contacted Andrew C. Rockefeller, then the president and director of the defendant, and expressed his interest in looking at available lots at Sherwood Farm. The plaintiff toured the available lots with John D. Freeman, then the executive vice president of the defendant, on May 7, 2004, and returned on his own several times. Subsequently, in a telephone conversation, the plaintiff informed Rockefeller that he had chosen lot 29 (lot), located at 22 Stillman Lane, and that he was willing to pursue reserving that lot.

Soon after, Freeman mailed to the plaintiff an "executed copy" of a reservation agreement, along with a letter dated June 9, 2004, in which he requested that the plaintiff sign and return a copy of the agreement to Freeman. The agreement provided that the $1.2 million price of the lot would be reserved until September 7, 2004. The agreement also called for the plaintiff to provide a $10,000 "good faith deposit" to the defendant. That good faith deposit, upon notification to the defendant, wholly was refundable to the plaintiff if he elected not to execute a purchase and sale agreement. If the plaintiff chose to purchase the lot, that money would be credited against the deposit required to purchase

the lot. The plaintiff also was required, under the agreement, to submit preliminary architectural and landscape plans, prepared at his expense, to the defendant by August 25, 2004, for submission to its design review board (review board). If, in the review board's discretion, the plans met the guidelines set out in Sherwood Farm's public offering statement, the plaintiff was obligated under the agreement to execute a purchase and sale agreement no later than September 7, 2004, and agree to a closing no later than October 1, 2004. Moreover, if the plaintiff failed to submit those preliminary plans to the review board by August 25, 2004, the agreement, by its terms, was null and void, and the plaintiff would be entitled to the return of his deposit. Last, the agreement stipulated that the plaintiff could terminate[3] the reservation at any time, resulting in the return of his deposit and the defendant's ability to place the lot back on the market. The plaintiff signed and returned the agreement to the defendant with a check for the full amount of the deposit.[4] The plaintiff thereafter received by mail a copy of the agreement countersigned by Rockefeller.

The plaintiff soon after engaged the services of Richard Sammons, an architect. The plaintiff and Sammons visited the lot in June. The plaintiff supplied Sammons

---

[3] The language of the agreement stated that the plaintiff "may cancel the agreement at any time." Because " '[c]ancellation' occurs when a party ends the contract by reason of breach by the other party [and] '[t]ermination' occurs when a party exercises a 'power created by agreement or law' to end the contract 'otherwise than for its breach' "; 2 A. Corbin, Contracts (Rev. Ed. 1995) § 6.10, p. 291; we shall utilize the term "terminate" in this opinion.

[4] Soon after his execution of this agreement, the plaintiff received from Mary A. Sacks, the defendant's secretary and treasurer, a letter dated June 29, 2004. Attached to that letter was an escrow agreement under the terms of which the plaintiff's deposit would be held. That agreement provided, inter alia, that the deposit "shall be released by the escrow agent, upon the written, joint instructions of [the plaintiff] and [the defendant], in accordance with such instructions." The plaintiff executed the escrow agreement, which was countersigned subsequently by Sacks.

with sketches and a list of features that the plaintiff and his wife, Anita Laudone, wanted incorporated into the design of the house. The plaintiff testified that he and Sammons visited the lot with the sketches and list of features in hand because he wanted Sammons to design a house that would be attractive on the lot and be tailor-made for their needs. In a letter to Sammons dated June 21, 2004, the plaintiff set out generally the parameters of the design, specifying that he wanted a house that was under 5000 square feet in size and would have a construction cost of $400 per square foot. He also mentioned that the design Sammons provided had to be approved by the review board under the terms of the reservation agreement. The plaintiff subsequently supplied Sammons with the Sherwood Farm design guidelines.

In July, and again in August, the plaintiff and Laudone reviewed the preliminary plans at Sammons' New York office. The plaintiff testified that the plans he and Laudone reviewed in August were for the design of a house that was larger than the plaintiff desired. The plaintiff testified that in early August, he telephoned Rockefeller. In that conversation, the plaintiff told Rockefeller that the plans that had been produced by Sammons would fabricate a house that went beyond the plaintiff's parameters in both square footage and expense of construction. The plaintiff testified that Rockefeller said he understood the difficulties facing the plaintiff and that the defendant "very much wanted to have [the plaintiff as] a resident" of Sherwood Farm. Rockefeller also told the plaintiff that the agreement's deadlines were no longer applicable to the plaintiff and that he could "take [his] time" in acquiring new plans that fit his needs and met the requirements of the review board. Freeman soon after telephoned the plaintiff, inquiring about the approaching deadline for the plaintiff's submission of

plans. The plaintiff related the substance of the conver-
sation he had had with Rockefeller and the assurances
Rockefeller had made to him concerning the deadline
in the agreement and his submission of the design
plans.[5] The plaintiff sent a letter dated September 14,
2004, addressed to Rockefeller at the defendant's place
of business, in response to his conversation with Free-
man. In it, the plaintiff verified to Rockefeller and Free-
man that he was "pursuing [the required design plans]
with [Sammons]" and that Sammons was "working on
a second round of plans which we hope to review soon
and then submit for perusal by the review board as
soon as possible."

After sending that letter, the plaintiff engaged Sam-
mons to draft a second set of plans for the house. The
plaintiff instructed Sammons to design a house that had
under 5000 square feet of floor space and was within
the plaintiff's budget constraints. Throughout the fall of
2004, the plaintiff and Laudone reviewed in Sammons'
office the plans for the house. The plaintiff testified
that he and Laudone took an active role in the design
process, giving Sammons input into the types of materi-
als to be used in construction as well as the appliances
to be installed so that the house would meet their budg-
etary requirements. Moreover, during the time period
from September through December, 2004, Sammons'
firm billed the plaintiff for 157 hours of architectural
services for the design of the plaintiff's home for the lot.

On December 10, 2004, the plaintiff received a tele-
phone call from Jonathan DuBois. In that conversation,

[5] At the time of the plaintiff's telephone conversation with Rockefeller,
Rockefeller was no longer president or director of the defendant. The plain-
tiff testified that he was not aware of that fact at the time of the conversation.
He also testified that Freeman, in their conversation subsequent to Rockefel-
ler's assurances to the plaintiff that he could take his time submitting design
plans, did not inform the plaintiff that Rockefeller was no longer president
or director. Rockefeller resigned as the defendant's president and director
on July 28, 2004. He remained, however, on the defendant's review board.

DuBois informed the plaintiff that Rockefeller was no longer the president of the defendant and that DuBois was the defendant's chief operating officer. DuBois inquired about the plaintiff's interest in the lot and the status of his pursuit of acquiring it. He also informed the plaintiff that the board of directors was considering whether the value of the lot had risen such that they ought to consider increasing its price. The plaintiff testified that DuBois "didn't say [the board of directors] had decided [to increase the price of the lot] at that point. What [DuBois] said . . . was, [that] he would advise me to hurry up and get the plans [submitted to the review board] so that [the board of directors] would not try to impose a new price . . . and that the quicker I could get the plans [submitted], the better." The plaintiff informed DuBois that his plans were near completion and that they would be submitted to the review board as soon as possible.

On December 21, 2004, the plaintiff's design plans were submitted to the review board. In a letter to David Kleiner, an architect with Sammons' firm, Robert L. Hart, an architect and member of the review board, requested that Kleiner forward directly to other board members copies of the plans. He also pointed out that the design guidelines indicated that the review process set out therein required submission of "landscape plans with more information [than was in the architectural plans already submitted] about the final 'look' of the property [including, which] existing trees [are] to be saved and how the street scene will blend together [with] the . . . Greenwich landscape." During the ensuing weeks, the submitted plans were reviewed by Hart and other members of the review board. Janet W. Foster, an architect, architectural historian and member of the faculty at Columbia University School of Design, reviewed the plaintiff's plans in conjunction with her

work with the review board. In a January 2, 2005 memorandum sent to Hart and subsequently forwarded to other members of the review board, Foster reported that the proposed house was within the guidelines for Sherwood Farm stylistically. She proclaimed the proposed house to be elegant and "far more sophisticated" than other homes in the development. On February 4, 2005, Hart sent a letter, via fax, to Kleiner in which he stated that the review board had completed its initial review of the architectural plans but that, in order for the board to complete its review, it required landscape plans.[6]

On February 7, 2005, DuBois sent an e-mail to the plaintiff, with an attached letter from him, stating that he was sending the letter at the direction of the defendant's board of directors. The letter indicated that the review board had not received "revised plans" for the proposed house to be constructed on the lot.[7] DuBois went on to state that, in order for the defendant to continue to reserve the lot for the plaintiff, it must increase the price. He explained that several lots had been reappraised over the previous summer to a valuation of $1.5 million to $1.6 million. DuBois indicated that, although the defendant found the design and building concept submitted by the plaintiff "highly favorable" and wanted the plaintiff as a resident in Sherwood Farm, if the plaintiff chose to terminate the reservation, the defendant would refund his deposit in full. Dubois concluded the letter by asking the plaintiff to inform Dubois whether he remained interested so Dubois could ask the board of directors to decide on the amount of the increase. On February 9, 2005, the plaintiff

---

[6] The letter referred Kleiner to the "Design Guidelines" for details concerning the requisite landscape plans.

[7] DuBois testified that as of February 7, 2005, the review board had not received the "full submission" of plans for the lot, which included a "fully developed . . . landscape plan."

responded via an e-mail in which he indicated that he had relied on the assurances from Rockefeller that the September 7, 2004 deadline had been waived when the plaintiff continued to pursue the design plans. He also stated that he was not contemplating paying a higher price for the lot than the $1.2 million price in the original reservation agreement. On May 2, 2005, Eugenie Verrillo, an attorney at Cummings and Lockwood LLC, the escrow agent holding the plaintiff's deposit, sent a letter to the plaintiff with a check for $10,000 attached. In the letter, Verrillo stated that the reservation agreement under which the plaintiff had deposited the money had become null and void due to the plaintiff's failure to comply with its conditions by September 7, 2004.

The plaintiff, thereafter, commenced this action and, on May 3, 2007, filed a second amended complaint, alleging breach of contract, promissory estoppel, breach of the implied covenant of good faith and fair dealing as well as violations of CUTPA and CIOA.[8] After a trial to the court, *Nadeau, J.*, and by memorandum of decision filed December 27, 2007, the court rendered judgment in favor of the plaintiff on his breach of contract claim and his promissory estoppel claim.[9] The court reserved judgment on the plaintiff's claims of violations of CUTPA and CIOA. On January 22, 2008, the court, *Nadeau, J.*, heard oral argument on those claims and, by memorandum of decision filed May 23, 2008, rendered judgment in favor of the plaintiff on

[8] The second amended complaint also contained a count for specific performance of the contract, which the plaintiff subsequently withdrew.

[9] The inconsistent judgment; see *Glazer* v. *Dress Barn, Inc.*, 274 Conn. 33, 88–89, 873 A.2d 929 (2005) (jury could not have found, consistent with verdict on breach of contract claim, that plaintiffs were entitled to prevail on promissory estoppel claim); *Torringford Farms Assn., Inc.* v. *Torrington*, 75 Conn. App. 570, 576, 816 A.2d 736 (doctrine of promissory estoppel serves as alternate basis to enforce agreement in absence of competing common-law considerations), cert. denied, 263 Conn. 924, 823 A.2d 1217 (2003); is addressed in part II of this opinion.

both claims.[10] The court, *Adams, J.*, then stated in a memorandum of decision filed September 15, 2008, that because of Judge Nadeau's absence and at the request of counsel for all parties, it had rendered judgment in favor of the plaintiff on July 10, 2008, on the basis of Judge Nadeau's decisions and certain financial calculations by the parties, and that on the basis of the parties' stipulation, it also was awarding the plaintiff damages in the amount of $400,000 plus $41,753.44 in prejudgment interest, as well as $241,765.84 in fees and costs. This appeal followed.[11]

The defendant makes several claims on appeal. First, the defendant claims that the court, for several reasons, improperly concluded that there was a valid oral modification to the reservation agreement. The defendant also claims that even if there was a valid oral modification to the reservation, the court improperly applied the doctrine of equitable estoppel to bar the defendant from asserting the statute of frauds as a defense. Next, the defendant claims that the court improperly found a violation of CUTPA because the evidence was insufficient to support a finding of unscrupulous and unethical conduct. The defendant claims also that the court

---

[10] On July 14, 2008, the plaintiff, pursuant to Practice Book § 66-5, filed a motion for articulation, which was granted. The plaintiff requested that the court articulate its ruling on the fourth count in his second amended complaint for breach of the implied duty of good faith and fair dealing. The court filed its articulation on October 14, 2008, in which it articulated that the court found in favor of the plaintiff on that count. It also stated that the ruling did not alter the plaintiff's damages.

[11] On June 10, 2008, the defendant filed an appeal, AC 30022. On July 29, 2008, the defendant filed an amended appeal in AC 30022 in order to include the judgment rendered on July 10, 2008. Also on July 29, 2008, the defendant filed an appeal taken from the July 10, 2008 judgment, AC 30163, raising issues identical to those raised in AC 30022. The defendant indicated to this court that it filed both appeals to ensure that this court had jurisdiction over all the claims it raised on appeal. The defendant, on September 25, 2008, filed a motion to consolidate the appeals, which this court granted on October 14, 2008. Also, the plaintiff filed a cross appeal in AC 30022 on June 19, 2008, which later was withdrawn.

improperly found violations of CIOA and the implied duty of good faith and fair dealing because the evidence adduced at trial did not support a finding of bad faith on the defendant's part. Last, the defendant claims that the court improperly awarded damages. We now discuss each of the defendant's claims in turn, as well as the issue of the inconsistent judgment rendered by the trial court.

I

CONTRACT CLAIMS

The defendant makes various claims regarding the oral modification to the reservation agreement. First, it claims that the modification was invalid because the underlying reservation agreement was an illusory contract because the plaintiff could terminate that agreement at will. The defendant also claims that if we conclude, however, that the underlying reservation agreement was not an illusory contract, then the oral modification was invalid because (1) there was no mutual assent to the meaning and conditions of the modification and (2) there was inadequate consideration for the modification. The defendant also claims that even if there existed mutual assent to the meaning and conditions of the modification and adequate consideration, the oral modification was barred by the statute of frauds. In addition, the defendant contends that the doctrine of part performance should not apply as an exception to the statute of frauds because the underlying reservation agreement was nonbinding. Moreover, if the statute of frauds does apply, the defendant argues that the plaintiff failed to demonstrate part performance of the modification sufficient to provide an exception to the statute of frauds. We now discuss each claim in turn.

## A

### Reservation Agreement

The defendant claims that because the plaintiff could terminate the underlying reservation agreement at will, it lacked mutuality of obligation and, as a result, was an illusory contract; therefore, the oral modification was invalid. The defendant also argues that the reservation agreement was not supported by sufficient consideration and, therefore, was not a binding contract, and, as a result, the modification was invalid. We disagree.

We begin by setting forth the applicable standard of review.[12] "The existence of a contract is a question of fact to be determined by the trier on the basis of all of the evidence. . . . On appeal, our review is limited to a determination of whether the trier's findings are clearly erroneous. . . . This involves a two part function: where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision; where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Internal quotation marks omitted.) *MD Drilling & Blasting, Inc.* v. *MLS Construction, LLC*, 93 Conn. App. 451, 454, 889 A.2d 850 (2006).

As we noted previously, under the reservation agreement the defendant would reserve the $1.2 million

---

[12] We note that the court did not expressly find a contract to exist between the parties. Because, however, it found in favor of the plaintiff on his breach of contract count and "[t]he elements of a breach of contract action [include] the formation of an agreement"; (internal quotation marks omitted) *Whitaker* v. *Taylor*, 99 Conn. App. 719, 728, 916 A.2d 834 (2007); it must have found a contract to exist.

purchase price of the lot until September 7, 2004. Also under the agreement, the plaintiff provided a $10,000 "good faith deposit" to the defendant. If the plaintiff chose to purchase the lot, that money would be credited against the deposit required for that purchase. That good faith deposit, upon notification to the defendant, was refundable if the plaintiff elected not to execute a purchase and sale agreement. Although the plaintiff, in order to pursue the purchase of the lot, was required, under the agreement, to submit preliminary architectural and landscape plans by August 25, 2004, his failure to do so would not have resulted in his loss of any portion of his deposit. Thereafter, if the review board approved the plans, the plaintiff, if he chose to purchase the lot, had to execute a purchase agreement no later than September 7, 2004. If the plaintiff, however, failed to submit those plans by August 25, 2004, the agreement, by its terms, was null and void. Last, the agreement stipulated that the plaintiff could terminate the reservation at any time resulting in the prompt return of his deposit and the defendant's ability to place the lot back on the market.[13]

The defendant argues that under the reservation agreement, the plaintiff could terminate at any time and receive his deposit back; therefore, the plaintiff did not

[13] The reservation agreement provides in relevant part: "Good [f]aith [d]eposit: [The plaintiff] shall pay to [the defendant] upon execution of this agreement the sum of . . . $10,000 . . . . The purpose of this [d]eposit is only to show good faith of the [plaintiff] . . . . The [defendant] will credit the [d]eposit paid pursuant to this [a]greement toward the deposit required for the purchase of [the lot]. If [the plaintiff] elects not to execute a [purchase and sale agreement] and notifies [the defendant] of its election, [the plaintiff's] [d]eposit shall be refunded promptly upon notification and [the defendant] will be free to immediately place [the lot] back on the market."

The reservation agreement was executed in conjunction with an escrow agreement. The escrow agreement provides in relevant part: "Release: The [e]scrow [a]mount shall be released by the [e]scrow [a]gent, *upon the written, joint instructions* of [the plaintiff] and [the defendant], in accordance with such instructions." (Emphasis added.)

promise to do anything, and the agreement did not form a binding contract. This is so, the defendant argues, because "[t]o agree to do something and reserve the right to [terminate] the agreement at will is no agreement at all." (Internal quotation marks omitted.) *R. F. Baker Co.* v. *P. Ballantine & Sons*, 127 Conn. 680, 683, 20 A.2d 82 (1941). The plaintiff contends that the reservation agreement was an option contract under which the plaintiff had the option of purchasing the lot for the set price by complying with the conditions of the agreement. We agree with the plaintiff.

"An option is a continuing offer to sell, irrevocable until the expiration of the time period fixed by agreement of the parties, which creates in the option holder the power to form a binding contract by accepting the offer. . . . The determination of the terms and conditions of [the] option contract must be resolved, in the absence of supplementary evidence of the intent of the parties, by reference to the terms of the contract itself." (Citation omitted; internal quotation marks omitted.) *Bayer* v. *Showmotion, Inc.*, 292 Conn. 381, 409, 973 A.2d 1229 (2009). An option contract and a contract of sale are in fact two separate and distinct contracts, namely, an option contract, and an agreement to sell. *Cutter Development Corp.* v. *Peluso*, 212 Conn. 107, 110, 561 A.2d 926 (1989). "An option, originally, is neither a sale nor an agreement to sell. It is not a contract by which one agrees to sell and the other to buy, but it is only an offer by one to sell within a limited time and a right acquired by the other to accept or reject such offer within such time. . . . The distinction between a contract to purchase and sell real estate and an option to purchase is that the contract to purchase and sell creates a mutual obligation on the one party to sell and on the other to purchase, while an option merely gives the right to purchase within a

limited time without imposing any obligation to purchase." (Citations omitted; internal quotation marks omitted.) Id.; see *Bethlehem Christian Fellowship, Inc.* v. *Planning & Zoning Commission*, 58 Conn. App. 441, 445–46, 755 A.2d 249 (2000) ("[u]nlike in option agreements, a buyer and seller in a contract to purchase land undertake mutual promises for the purchase and sale of the property").

Whether the agreement in question is to be construed as a mutually binding contract or a mere option to purchase is "a question of the intent of the parties, to be determined, as a matter of fact, from the language of the contract, the circumstances attending its negotiation, and the conduct of the parties in relation thereto." *Kakalik* v. *Bernardo*, 184 Conn. 386, 393, 439 A.2d 1016 (1981). In other words, "[w]hether the nature of a contract is an option or a bilateral obligation . . . is to be determined . . . by the nature of the obligations which it imposes." (Internal quotation marks omitted.) *Cutter Development Corp.* v. *Peluso*, supra, 212 Conn. 111.

Under the reservation agreement, the plaintiff clearly had the option, by complying with the conditions of the agreement, to purchase the lot for the reserved price for a set period of time. See id., 112 ("a distinguishing feature of an option contract is that it imposes no binding obligation on the option holder to complete the purchase"). The defendant conceded as much in its brief to this court when it stated that the "plaintiff's contractual 'promise' amounted to nothing more than an agreement that he would continue to consider the possibility of exercising his option to purchase the lot." The reservation agreement's language supports that conclusion, as well. See footnote 13 of this opinion.

Our review of the agreement, the circumstances surrounding its negotiation and execution, along with the parties' subsequent actions, even those taken before the

purported oral modification, all support the conclusion that the parties entered into an option contract under which the plaintiff was not bound to purchase the lot. Because an option contract for the purchase of land merely grants to one party the right to purchase the land within a limited time under its terms without imposing any obligation to purchase and, consequently, creates no mutual obligation on the parties; see *Cutter Development Corp.* v. *Peluso*, supra, 212 Conn. 110; the defendant's claim that the contract in question was illusory for a want of mutuality of obligation has no merit.[14]

[14] We further conclude that the reservation agreement contained the minimum essential terms of a binding purchase and sale agreement for real estate, as required under Connecticut law for option contracts. See *Bayer* v. *Showmotion, Inc.*, supra, 292 Conn. 412–13 (option contract must include essential terms of contract for sale of real property: parties, description of subject of sale, and terms of payment, including basis for determining total purchase price and amount, if any, of purchase money mortgage). The agreement indicated that the defendant supplied the plaintiff with a copy of the purchase agreement to be executed, along with the public offering statement. The agreement indicated the parties and purchase price and described the lot sufficiently. In addition, it provided that the "[p]urchase [p]rice shall be payable in full on the date specified by [the defendant] in the [p]urchase [a]greement," that the lot would be conveyed by warranty deed subject to covenants and restrictions in the public offering statement and that the good faith deposit would be applied fully to the deposit required to purchase the lot.

Moreover, the language of the reservation agreement set out the precise manner in which the plaintiff could exercise his option. See *Bayer* v. *Showmotion, Inc.*, supra, 292 Conn. 409 ("To be effective, an acceptance of an offer under an option contract must be unequivocal, unconditional, and in exact accord with the terms of the option. . . . If an option contract provides for payment of all or a portion of the purchase price in order to exercise the option, the optionee . . . must not only accept the offer but pay or tender the agreed amount within the prescribed time." [Internal quotation marks omitted.]). Under the reservation agreement, for the plaintiff to exercise his option to purchase the lot for the reserved price, he not only had to submit a $10,000 good faith deposit, he also had to submit design plans by a certain date for approval by the review board. In addition, he was required to execute a purchase agreement and to close on the lot by certain dates. Because the plaintiff's acceptance under the reservation agreement had to be unequivocal, unconditional and in exact accord with its terms, barring modification, his failure would have resulted in an ineffective

The defendant also argues that the reservation agreement was not supported by sufficient consideration and that it, therefore, was not a binding contract, and, as a result, the modification was invalid. Specifically, it argues that, because the plaintiff's $10,000 deposit was held in escrow, not available for the defendant's use and wholly refundable to the plaintiff, along with accumulated interest under the escrow agreement, it represented nothing of value to the defendant, and, as a result, the reservation agreement was not supported by consideration. We disagree.

We start by setting forth the applicable legal principles and our standard of review.[15] In an option contract, "[t]he option giver's promise is enforceable, in spite of lack of mutuality of obligation. The option giver has made a promise, while the option holder has made none, but the promise is not enforceable and there is no 'contract' unless the promisee has given a consideration or there is some other basis for enforcement of the promise." 2 A. Corbin, Contracts (Rev. Ed. 1995) § 6.1, pp. 200–201. Usually, an option holder pays cash or gives some other executed consideration for his option. Id., p. 200. "It almost goes without saying that consideration is [t]hat which is bargained-for by the promisor and given in exchange for the promise by

_____

acceptance, and the defendant would no longer have been bound by the agreement's terms. See id.

[15] We note that the court did not expressly find consideration. It did, however, find in favor of the plaintiff on his breach of contract claim. Because the elements of a breach of contract include the formation of an agreement; see *American Express Centurion Bank* v. *Head,* 115 Conn. App. 10, 15–16, 971 A.2d 90 (2009); which, in turn, requires the presence of adequate consideration; see *Thibodeau* v. *American Baptist Churches of Connecticut,* 120 Conn. App. 666, 676, 994 A.2d 212 (2010); we presume that the court must have found the presence of adequate consideration. Cf. *Johnson* v. *de Toledo,* 61 Conn. App. 156, 162, 763 A.2d 28 (2000) (appellate court entitled to assume, unless it appears to contrary, that trial court acted properly in forming determinations, including considering applicable legal principles), appeal dismissed, 258 Conn. 732, 785 A.2d 192 (2001).

the promisee . . . . We also note that [t]he doctrine of consideration does not require or imply an equal exchange between the contracting parties. . . . Consideration consists of a benefit to the party promising, or a loss or detriment to the party to whom the promise is made. . . . Whether an agreement is supported by consideration is a factual inquiry reserved for the trier of fact and subject to review under the clearly erroneous standard." (Internal quotation marks omitted.) *Martin Printing, Inc.* v. *Sone*, 89 Conn. App. 336, 345, 873 A.2d 232 (2005).

On the basis of our review of the record, we conclude that the plaintiff gave adequate consideration to make enforceable the defendant's promise to reserve the lot at the agreed upon price for the duration of the option contract. First, we note that in return for the option to purchase the lot at the reserve price, the plaintiff gave up his unfettered use of the $10,000 deposit money for the duration of the option contract. See id. ("[c]onsideration consists of a benefit to the party promising, or a loss or detriment to the party to whom the promise is made" [internal quotation marks omitted]); see also *Benson* v. *Chalfonte Development Corp.*, 348 So. 2d 557, 559–60 (Fla. App. 1976) ("[a]lthough, under the terms of the option, appellants were to receive any accumulated interest if their deposits were returned, a jury might find that appellants suffered some detriment and inconvenience in that they were deprived of the free and unrestricted use of their money during the period it was on deposit"), cert. denied, 354 So. 2d 979 (Fla. 1977); *King* v. *Hall*, 306 So. 2d 171, 173 (Fla. App. 1975) ("While buyer's . . . deposit could have been [with]-drawn . . . it did constitute sufficient consideration . . . as it was a detriment or inconvenience to buyer to post it. It was done to show good faith and buyer was deprived of the use of the money during the period it was posted. It does not matter that the burden to

buyer was small or that the benefit to sellers was small."). The deposit was a requirement under the agreement, even though under the terms of the agreement, if the plaintiff elected not to execute a purchase and sale agreement and notified the defendant, the $10,000 deposit was refundable to the plaintiff.[16] The defendant also benefited from the required deposit in that it demonstrated the good faith of the plaintiff in pursuing the purchase of the lot under the provisions of the reservation agreement. Moreover, under the terms of the reservation agreement, the subsequent purchase and sale agreement would require that upon its execution, the deposit would be paid to the defendant as part of the deposit required to purchase the lot. These requirements placed on the plaintiff under the reservation agreement were benefits bargained for by the defendant in exchange for holding the lot at the reserved price for the duration of the agreement. The extent of the benefit gained by the defendant, or the detriment to the plaintiff, is of no moment here because "[t]he doctrine of consideration does not require or imply an equal exchange between the contracting parties." (Internal quotation marks omitted.) *Christian* v. *Gouldin*, 72 Conn. App. 14, 23, 804 A.2d 865 (2002). Additionally, "[t]he general rule is that, in the absence of fraud or other unconscionable circumstances, a contract will not be rendered unenforceable at the behest of one of the contracting parties merely because of an inadequacy of consideration." (Internal quotation marks omitted.) Id.

On the basis of our review of the record, we conclude that the court's finding that the reservation agreement was a valid contract was not clearly erroneous. Because the reservation agreement was an option contract that gave to the plaintiff the right to purchase the lot within

---

[16] The agreement provided that the plaintiff "shall pay to" the defendant the sum of $10,000 as a good faith deposit.

a limited time frame without imposing any obligation to purchase; see *Cutter Development Corp.* v. *Peluso*, supra, 212 Conn. 110; and was supported by adequate consideration, we now turn to the purported oral modification of that contract.

## B

### Oral Modification

The defendant claims that the oral modification was invalid because (1) there was no mutual assent to the meaning and conditions of the modification and (2) there was inadequate consideration for the modification. Specifically, the defendant claims that the record does not support the court's finding of a valid modification.[17] The defendant argues that the record reflects that there was no mutual assent between the parties to the modification of the reservation agreement from a ninety day option into an unlimited, open-ended option with no deadline. Furthermore, the defendant argues that even if there had been mutual assent, the plaintiff gave nothing in return for the extension of his option. As a result, the defendant asserts, the court's finding of a valid modification was clearly erroneous. We disagree.

"[W]hether the parties to a contract intended to modify the contract is a question of fact. . . . The resolution of conflicting factual claims falls within the province of the trial court. . . . The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witness. . . . For a valid modification to exist, there must be mutual assent

---

[17] Insofar as the defendant challenges the credibility determinations of the court, we reject any such claims. It is axiomatic that the credibility of witnesses is the sole province of the trial court. See *Conservation Commission* v. *Red 11, LLC*, 119 Conn. App. 377, 391, 987 A.2d 398, cert. denied, 295 Conn. 924, 991 A.2d 566 (2010).

to the meaning and conditions of the modification and the parties must assent to the same thing in the same sense. . . . Modification of a contract may be inferred from the attendant circumstances and conduct of the parties." (Citation omitted; internal quotation marks omitted.) *Tsionis* v. *Martens*, 116 Conn. App. 568, 577, 976 A.2d 53 (2009). "A modification of an agreement must be supported by valid consideration and requires a party to do, or promise to do, something further than, or different from, that which he is already bound to do." (Internal quotation marks omitted.) *Christian* v. *Gouldin*, supra, 72 Conn. App. 23.

The plaintiff testified that after concluding that the plans for the house were not acceptable to him, he called Rockefeller sometime in early August, 2004. He informed Rockefeller that he would be starting the process of designing a house anew. The plaintiff continued: "Rockefeller said that he understood the problem I was having with the design of the house. He said that [the defendant] very much wanted to have me be a resident . . . and that I would be allowed to work on the new plans and I could take my time. . . . [H]e used that phrase several times, indicating that the deadlines that were in the written document, to me, were no longer applicable. He said I could take my time. I made it clear to him it was going to be a matter of weeks or two or three months to get a new set of plans done. And he said I could take my time. I didn't have to worry." Rockefeller corroborated the plaintiff's testimony that he, Rockefeller, had agreed to extend the deadline in the reservation agreement to accommodate the plaintiff's need to start the design process anew.[18] Thereafter, the

---

[18] As noted previously, the plaintiff next sent Rockefeller a letter dated September 14, 2004. In it, the plaintiff verified that he was "pursuing [the required design plans] with [Sammons]" and that Sammons was "working on a second round of plans which we hope to review soon and then submit for perusal by the review board as soon as possible."

plaintiff continued pursuing the design plans with Sammons.

The defendant essentially argues that because the plaintiff and Rockefeller never specifically discussed modifying the actual terms of the reservation agreement, there was no "mutual assent to the meaning and conditions of the modification, [and no] assent to the same thing in the same sense." (Internal quotation marks omitted.) *Tsionis* v. *Martens*, supra, 116 Conn. App. 577. The defendant asserts that because there were agreed on deadlines in the reservation agreement for various events to occur,[19] the agreement that the plaintiff could take his time did not amount to a meeting of the minds as to the meaning and conditions of the modification. Moreover, modifying the reservation agreement to have "no deadline at all is directly at odds with the basic definition of an option" and further supports that there was no mutual assent to the modification. See *Bayer* v. *Showmotion, Inc.*, supra, 292 Conn. 409 (option is continuing offer to sell, irrevocable until expiration of time period fixed by agreement of parties, which creates in option holder power to form binding contract by accepting offer).

On the basis of our thorough review of the record before us, we conclude that the court was not clearly erroneous in finding that there was a mutual understanding to modify the reservation agreement, extending it until the plaintiff's design plans were accepted or rejected. Because the modification of a contract may be inferred from the attendant circumstances and conduct of the parties; see *Tsionis* v. *Martens*, supra, 116 Conn. App. 577; we underscore the following facts gleaned from the record. The plaintiff

---

[19] For example, the reservation agreement provided that the execution of a purchase and sale agreement was to occur no later than September 7, 2004, and for a closing to occur no later than October 1, 2004.

testified that, on the basis of his conversation with Rockefeller seeking an extension of the deadline for his submission of design plans, "[o]ur general understanding [concerning the modification of the reservation agreement] was that as long as I was working on plans in good faith, we still had a deal." His conduct after the conversation comports with such an understanding because the record reveals that the plaintiff pursued acquiring the design plans in the ensuing months. Rockefeller's testimony, as the court found, corroborated the plaintiff's testimony that, as a result of their conversation, there was an understanding that he could take his time obtaining the requisite design plans. Moreover, Rockefeller testified that because of the cumbersome process involved in purchasing a lot from the defendant, there was a policy of flexibility in modifying reservation agreements regarding the dates of performance.[20] As a result, we conclude that the court properly determined that the oral modification was valid in that the parties mutually assented to the meaning and conditions of the modification.

The defendant also claims that any modification to the reservation agreement was not supported by consideration because the plaintiff exchanged nothing of value

[20] During Rockefeller's direct examination by the plaintiff's counsel, the following exchange took place:

"Q. [Among the] between fifteen and twenty lots [sold by the defendant prior to the plaintiff executing a reservation agreement], did any of those have reservation agreements, the dates for performance [of] which were modified?

"A. Oh, yeah.

"Q. So, those modifications happened prior to June of 2004?

"A. It's a big process for someone buying a lot—getting an architect with restrictions, building and moving in. We want to give [individuals who have executed reservation agreements] all the flexibility that's possible. If we see something going wrong down the road, we may toughen up on it and if we get to stage two and we don't like the house or if the potential owner is doing something we don't like, then we have to sit down and negotiate. It's a very flexible system."

in return for an extension on his option. As previously noted, "[t]he doctrine of consideration is fundamental in the law of contracts, the general rule being that in the absence of consideration an executory promise is unenforceable. . . . While mutual promises may be sufficient consideration to bind parties to a modification . . . a promise to do that which one is already bound by his contract to do is not sufficient consideration to support an additional promise by the other party to the contract." (Citations omitted; internal quotation marks omitted.) *New England Rock Services, Inc.* v. *Empire Paving, Inc.*, 53 Conn. App. 771, 776, 731 A.2d 784, cert. denied, 250 Conn. 921, 738 A.2d 658 (1999).

The reservation agreement required the plaintiff to pay to the defendant a $10,000 good faith deposit. Under the terms of that agreement, that deposit was to be either refunded if the plaintiff elected not to execute a purchase and sale agreement or paid over to the defendant to be applied to the deposit required to purchase the lot if the plaintiff executed a purchase and sale agreement. We determined that the $10,000 deposit was adequate consideration to support the reservation agreement. See part I A of this opinion. Under the terms of the reservation agreement prior to modification, the good faith deposit either was to be returned to the plaintiff or applied to the deposit required to purchase the lot by September 7, 2004. In order to keep his option to purchase the lot at the reserved price, the plaintiff was not bound, under the reservation agreement, to permit the defendant to retain the deposit after that date. On May 2, 2005, the defendant forwarded to the plaintiff a check for $10,000 along with a letter declaring that the reservation agreement was null and void for the plaintiff's failure to comply with its conditions by September 7, 2004. Because the deposit was not returned to the plaintiff until May 2, 2005, the defendant

retained the benefits for which it bargained under the reservation agreement through the duration of the oral modification. Therefore, in light of our conclusion in part I A of this opinion that the deposit was valid consideration supporting the reservation agreement, we conclude that the plaintiff's permitting the deposit to be retained by the defendant was valid consideration supporting the modification. As a result, on the basis of the record before us, we conclude that the court properly determined that the oral modification of the reservation agreement was valid.

C

The Statute of Frauds

The defendant also claims that even if there was a valid oral modification to the reservation agreement, the court improperly applied the doctrine of equitable estoppel to bar the defendant from asserting the statute of frauds as a defense.[21] We disagree.

"The doctrine of equitable estoppel is well established. [W]here one, by his words or actions, intentionally causes another to believe in the existence of a certain state of things, and thereby induces him to act on that belief, so as injuriously to affect his previous position, he is [precluded] from averring a different state of things as existing at the time." (Internal quotation marks omitted.) *Blackwell* v. *Mahmood,* 120 Conn. App. 690, 694–95, 992 A.2d 1219 (2010). "The party claiming estoppel . . . has the burden of proof. . . . Whether that burden has been met is a question of fact that will not be overturned unless it is clearly erroneous.

---

[21] The court found, and the parties agree on appeal, that the oral modification of the reservation agreement was subject to General Statutes § 52-550, our statute of frauds. Because the oral modification extended an option to purchase real property at a reserved price, we agree. See *Montanaro Bros. Builders, Inc.* v. *Snow,* 190 Conn. 481, 485, 460 A.2d 1297 (1983) (option agreements relating to interests in real property fall within statute of frauds).

. . . A court's determination is clearly erroneous only in cases in which the record contains no evidence to support it, or in cases in which there is evidence, but the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . The legal conclusions of the trial court will stand, however, only if they are legally and logically correct and are consistent with the facts of the case. . . . Accordingly, we will reverse the trial court's legal conclusions regarding estoppel only if they involve an erroneous application of the law." (Internal quotation marks omitted.) Id., 694.

"Equitable estoppel is a doctrine that operates in many contexts to bar a party from asserting a right that it otherwise would have but for its own conduct. . . . In its general application, we have recognized that [t]here are two essential elements to an estoppel—the party must do or say something that is intended or calculated to induce another to believe in the existence of certain facts and to act upon that belief, and the other party, influenced thereby, must actually change his position or do some act to his injury which he otherwise would not have done. . . . This court previously has applied the doctrine of equitable estoppel to bar a party from asserting the statute of frauds as a defense so as to prevent the use of the statute itself from accomplishing a fraud." (Citations omitted; internal quotation marks omitted.) *Glazer* v. *Dress Barn, Inc.*, 274 Conn. 33, 60, 873 A.2d 929 (2005).

"Thus, in sum, the elements required for part performance are: (1) statements, acts or omissions that lead a party to act to his detriment in reliance on the contract; (2) knowledge or assent to the party's actions in reliance on the contract; and (3) acts that unmistakably point to the contract. . . . Under this test, two separate but related criteria are met that warrant precluding a party from asserting the statute of frauds. . . . First, part

performance satisfies the evidentiary function of the statute of frauds by providing proof of the contract itself. . . . Second, the inducement of reliance on the oral agreement implicates the equitable principle underlying estoppel because repudiation of the contract by the other party would amount to the perpetration of a fraud." (Citations omitted; internal quotation marks omitted.) Id., 62–63.[22]

The court found that "[t]he forbearing assurances of . . . Rockefeller, without the specter of a price increase, obviously kept [the] plaintiff working with and paying [Sammons]. [Equally] clear is that through the vast bulk of that period the company had knowledge of and assented to the continuation of [the] plaintiff's work, of his spending money and of his making submissions to it." The court noted that it next had to determine whether those "detrimental reliance type of actions by a plaintiff" were of such a character that they could be naturally and reasonably accounted for in no other way than by the existence of some contract in relation to the subject matter in dispute. The court found that standard was "well and clearly met. No defense suggestion nor any court exertion of imagination suggests a different rationale for this commissioning of a widely renowned architect to make and revise plans (and to supplement with landscape detail, including which trees would be saved) beyond [the] plaintiff being given to understand [that] he could and should so proceed with [the] defendant's forbearance having been expressed." We agree with the court.

---

[22] "In the context of the statute of frauds . . . [our courts] sometimes have referred to the application of estoppel as the doctrine of part performance . . . ." (Internal quotation marks omitted.) *Glazer* v. *Dress Barn, Inc.*, supra, 274 Conn. 62. Our Supreme Court has stated: "[A]lthough this court on occasion has used the terms interchangeably, we never . . . intended that the doctrine of equitable estoppel and the doctrine of part performance operate as independent exceptions to the statute of frauds. . . . Rather, part performance is an essential element of the estoppel exception to the statute of frauds." (Citations omitted.) Id., 63.

The record reveals that after the oral modification, the plaintiff engaged Sammons to draft a second set of plans for the house for the lot that met the plaintiff's aesthetic and budgetary needs. Throughout the fall of 2004, the plaintiff and Laudone continued to take an active role in the design process. Moreover, during the time period from September through December, 2004, Sammons' firm billed the plaintiff for 157 hours of architectural services for the design of the plaintiff's home for the lot. The plans themselves, as well as other exhibits before the court, showed that the design process engaged in by the plaintiff was specifically aimed at lot 29 in order to accommodate its size, shape, topography and orientation to the street.[23] Moreover, the plaintiff, when directed by the defendant to submit his plans in December, 2004, submitted the plans that resulted from his efforts with Sammons to design a house for the lot. Tellingly, the defendant submitted those plans to its design review board. Thus, the record shows clearly that the plaintiff continued to pursue the design plans requisite in the reservation agreement and that the defendant exhibited its assent to that pursuit.

On the basis of our review of the record, we conclude that the plaintiff has demonstrated acts that constitute part performance of the oral modification to the reservation agreement. We further conclude that those acts were in pursuance of that oral modification, with the design of carrying the reservation agreement into execution, and were done with the assent, express or implied, or knowledge of the defendant and were such

___

[23] For example, in her memorandum to the defendant, Foster, a member of the design review board, stated that the plans for the house used the difficult topography of the lot to its advantage. She also commented that the new placement of the pool—behind the parking court, rather than directly behind the house—improved on the previous plans. That was so, she concluded, because for nine months of the year it would be covered, and in its former location would have been "a distraction rather than a compliment to the loggia."

acts that altered the relations of the parties. Likewise, we conclude that they were of such a character that they could be naturally and reasonably accounted for in no other way than by the existence of a valid oral modification of the reservation agreement. See *Glazer* v. *Dress Barn, Inc.*, supra, 274 Conn. 60–65. The actions of the plaintiff, in conjunction with the defendant's assent to them, were sufficient as part performance of the oral modification of the reservation agreement such that we conclude that the court properly applied the doctrine of equitable estoppel to bar the defendant from asserting the statute of frauds as a defense. See id., 60–63.

II

INCONSISTENT JUDGMENT

Because we affirmed in part I of this opinion the court's finding of a valid contract between the parties, we now address the inconsistent judgment as to the complaint's breach of contract and promissory estoppel counts that the court rendered in favor of the plaintiff. Addressing this issue, initially, we note the following facts and procedural history that inform our resolution of this matter. On May 3, 2007, the plaintiff filed a second amended complaint, alleging, inter alia, breach of contract and promissory estoppel. See Practice Book § 10-25. The court, by memorandum of decision, rendered judgment in favor of the plaintiff on both counts.[24] At no time did the parties seek to clarify or to rectify this inconsistent judgment with the trial court pursuant to

---

[24] In its December 27, 2007 memorandum of decision, the court concluded: "The *Glazer* [v. *Dress Barn, Inc.*, supra, 274 Conn. 60–65] analysis . . . would seem to dictate that, in the name of logical consistency, [the] plaintiff should be held to have prevailed on his count three estoppel claim, as to which the damages thus far pronounced would be identical to the count one breach of contract claim." Subsequently, the judgment file issued on July 30, 2008, provided that the court "found the issues for the plaintiff on counts one and three of the amended complaint."

our rules of practice. Moreover, the defendant did not raise the issue of an inconsistent judgment in its appeals to this court. In addition, although the defendant appealed from the entire judgment rendered against it, it failed to raise any claim on appeal concerning the promissory estoppel count, a circumstance that could render moot its breach of contract claim. See *Conservation Commission* v. *DiMaria*, 119 Conn. App. 763, 768, 989 A.2d 131 (2010) (appellate courts do not decide moot questions, disconnected from granting of actual relief or from determination of which no practical relief can follow). Under the circumstances present, these factors lead us to conclude that this court must invoke, sua sponte, our supervisory powers pursuant to Practice Book § 60-2 to resolve this issue in the interest of judicial economy and to ensure the fair and just administration of justice by our courts. See, e.g., *State* v. *James*, 261 Conn. 395, 410–11, 802 A.2d 820 (2002); *State* v. *Mukhtaar*, 253 Conn. 280, 290 n.11, 750 A.2d 1059 (2000).

Because the elements of a breach of contract include the formation of an agreement; see *American Express Centurion Bank* v. *Head*, 115 Conn. App. 10, 15–16, 971 A.2d 90 (2009); which, in turn, requires the presence of adequate consideration; see *Thibodeau* v. *American Baptist Churches of Connecticut*, 120 Conn. App. 666, 676, 994 A.2d 212 (2010); and promissory estoppel is appropriate when there is an absence of consideration to support a contract; see *Glazer* v. *Dress Barn, Inc.*, supra, 274 Conn. 88; we conclude that the court rendered an inconsistent judgment when it found in favor of the plaintiff on both counts. Moreover, "[a] duty of construction is placed upon the trial court whenever a party pleads inconsistent theories of recovery. . . . Although a party may plead, in good faith, inconsistent facts and theories, a court may not award a judgment on inconsistent facts and conclusions. A judgment, read

in its entirety, must admit of a consistent construction. . . . Where a party is entitled to only a single right to recover, it is the responsibility of the trial court to determine which of the inapposite sets of facts the party has proved, and then to render judgment accordingly." (Citations omitted.) *DeVita* v. *Esposito*, 13 Conn. App. 101, 107, 535 A.2d 364, cert. denied, 207 Conn. 807, 540 A.2d 375 (1988).

On the basis of our review of the record before us, our research of the relevant case law and the parties' actions; see *Taft* v. *Wheelabrator Putnam, Inc.*, 255 Conn. 916, 917–18, 763 A.2d 1044 (2000) (*McDonald, C. J.*, dissenting) (court must consider actions of parties in determining if vacatur appropriate); we conclude that the circumstances here present an extraordinary case in which the public interest, as well as the fair administration of justice to the parties, requires that we invoke our supervisory powers and vacate the court's judgment in favor of the plaintiff on his promissory estoppel count. See *State* v. *Boyle*, 287 Conn. 478, 489, 949 A.2d 460 (2008) ("[O]ur law of vacatur, though scanty . . . recognizes that [j]udicial precedents are presumptively correct and valuable to the legal community as a whole. They are not merely the property of private litigants and should stand *unless a court concludes that the public interest would be served by a vacatur.*" [Emphasis added.]). Although in the usual circumstance in which a trial court renders an inconsistent judgment and this court vacates the judgment and remands the case for a new trial; see *Marrin* v. *Spearow*, 35 Conn. App. 398, 403, 646 A.2d 254 (1994); that course would serve only to work an injustice on the parties under the particular circumstances present here, as well as to tax unnecessarily our scant judicial resources. See *In re Candace H.*, 259 Conn. 523, 527, 790 A.2d 1164 (2002), citing *U.S. Bancorp Mortgage Co.* v. *Bonner Mall Partnership*, 513 U.S. 18, 26, 115 S. Ct. 386, 130

L. Ed. 2d 233 (1994) (vacatur appropriate when public interest served). Moreover, although the defendant did not raise any claim on appeal as to the promissory estoppel claim, under all the circumstances present, it would be unfair to bind it to a judgment rendered in error. See *Private Healthcare Systems, Inc.* v. *Torres,* 278 Conn. 291, 304–305, 898 A.2d 768 (2006) (equitable considerations regarded in determination to vacate judgment). Last, we note that to leave an inconsistent judgment intact could spawn unwanted legal consequences. See *State* v. *Boyle,* supra, 490. Therefore, under the unique circumstances of this case, in which an alternative resolution to this issue may well work mischief on the parties,[25] undermine the public interest in the fair administration of justice and unnecessarily tax our judicial resources, we invoke our inherent supervisory powers and vacate the judgment as to count three of the plaintiff's second amended complaint alleging promissory estoppel.

## III

## CUTPA

Next, the defendant claims that the court improperly found a violation of CUTPA because the evidence adduced at trial did not support a finding of unscrupulous and unethical conduct. We disagree.

---

[25] For instance, a remand for a new trial; see *Marrin* v. *Spearow,* supra, 35 Conn. App. 403; would result in an inordinate increase in litigation expenses. If we conclude that the error is harmless; see *Pleines* v. *Franklin Construction Co.,* 30 Conn. App. 612, 616, 621 A.2d 759 (1993) (judgment as to breach of contract and unjust enrichment harmless because evidence sufficient to support judgment against defendant for identical damages under either theory); the defendant's appeal on the breach of contract claim likely would become moot under the circumstances. See *Conservation Commission* v. *DiMaria,* supra, 119 Conn. App. 768. We also note that to dispose of this issue simply by concluding that the parties failed to raise it; *Morant* v. *Commissioner of Correction,* 117 Conn. App. 279, 300 n.5, 979 A.2d 507 (claims not raised or briefed on appeal are deemed abandoned), cert. denied, 294 Conn. 906, 982 A.2d 1080 (2009); could result in a judgment, rendered in error, having full legal force and effect against the defendant.

The court, in its May 23, 2008 memorandum of decision, expressly found that the defendant's conduct was both unethical and unscrupulous and caused a substantial injury to the plaintiff, thereby meeting the second and third prongs of the "cigarette rule." "[General Statutes §] 42-110b (a) provides that [n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the federal trade commission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other business persons]." (Internal quotation marks omitted.) *Harris* v. *Bradley Memorial Hospital & Health Center, Inc.*, 296 Conn. 315, 350, 994 A.2d 153 (2010). Moreover, "[a]ll three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. . . . Thus a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy." (Internal quotation marks omitted.) *Glazer* v. *Dress Barn, Inc.*, supra, 274 Conn. 82–83.

"It is well settled that whether a defendant's acts constitute . . . deceptive or unfair trade practices under CUTPA, is a question of fact for the trier, to which, on appellate review, we accord our customary deference. . . . [W]here the factual basis of the court's

decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Internal quotation marks omitted.) *Chamlink Corp.* v. *Merritt Extruder Corp.*, 96 Conn. App. 183, 189, 899 A.2d 90 (2006). "The facts found must be viewed within the context of the totality of circumstances which are uniquely available to the trial court." (Internal quotation marks omitted.) *Ancona* v. *Manafort Bros., Inc.*, 56 Conn. App. 701, 715, 746 A.2d 184, cert. denied, 252 Conn. 953, 749 A.2d 1202 (2000).

On appeal, the defendant claims that there was no evidence in the record to support the court's finding that the defendant's conduct was unscrupulous and unethical, and, therefore, the court improperly found that it had violated CUTPA.[26] We disagree. The court found that the defendant, by its conduct, from September, 2004, through February, 2005, when it breached the reservation agreement, led the plaintiff to believe that an oral modification was entered into by the parties. It further found that the defendant's conduct led the plaintiff to believe that that modification was being honored by the defendant. The court also found that the defendant had knowledge of and assented to the plaintiff's expending money in pursuit of the plans for the home for lot 29. The court found untenable the defendant's contention that it could terminate the agreement because the plaintiff was stalling on the purchase of lot 29 until he sold his existing house.[27]

[26] The defendant also claims that if it prevails on appeal in its claims concerning the breach of contract judgment rendered against it, then there was no enforceable oral modification to the reservation agreement, and, as a result, the court improperly found a violation of CUTPA and CIOA. Because we affirm the judgment rendered in favor of the plaintiff on his breach of contract count, we need not address this claim.

[27] The record reveals that at the time of the breach, the plaintiff's existing house had been on the market for almost two years.

On the basis of our review of the record, we conclude that the court's finding is supported by the evidence and that the defendant's claim otherwise has no merit. The record amply supports the court's finding of a CUTPA violation. The record reveals that the defendant, during the period when the plaintiff was pursuing the purchase of the lot under the oral modification of the reservation agreement, had knowledge, through its own reappraisals, that several lots in Sherwood Farm had increased in value. Despite this knowledge, its conduct led the plaintiff to believe that the oral modification of the reservation agreement was being honored. Even when the defendant inquired about the plaintiff's progress in December, 2004, it urged him unambiguously to submit the plans as soon as possible in order to avoid a possible price increase. Those plans were submitted eleven days later. Then, after receiving, reviewing and assessing those plans positively, the defendant raised the price for the lot by $400,000. Therefore, the court's findings that the defendant's conduct, in inducing the plaintiff to pursue the design plans and the purchase of lot 29 after the original term of the reservation agreement had expired, and then increasing the price in contravention of that agreement, thus depriving the plaintiff of the benefit of his bargain, was unscrupulous and unethical, are supported by the evidence adduced at trial. Accordingly, we conclude that the court's findings are not clearly erroneous.

IV

## CIOA AND THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

The defendant also claims that the court improperly found violations of CIOA and the implied duty of good faith and fair dealing because the evidence adduced at trial did not support a finding of bad faith on the defendant's part. We disagree.

"The duty of good faith under General Statutes § 47-211 requires that [e]very contract or duty governed by [CIOA] imposes an obligation of good faith in its performance or enforcement. The common-law duty of good faith and fair dealing implicit in every contract requires that neither party [will] do anything that will injure the right of the other to receive the benefits of the agreement. . . . Essentially it is a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended." (Internal quotation marks omitted.) *Elm Street Builders, Inc.* v. *Enterprise Park Condominium Assn., Inc.*, 63 Conn. App. 657, 664–65, 778 A.2d 237 (2001). "To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." (Internal quotation marks omitted.) *De La Concha of Hartford, Inc.* v. *Aetna Life Ins. Co.*, 269 Conn. 424, 433, 849 A.2d 382 (2004). Whether a party has acted in bad faith is a question of fact, subject to the clearly erroneous standard of review. *Renaissance Management Co.* v. *Connecticut Housing Finance Authority*, 281 Conn. 227, 240, 915 A.2d 290 (2007).

The court based its finding of bad faith on the same conduct that it concluded was unscrupulous and unethical in its holding on the plaintiff's CUTPA claim. For the reasons set forth in part III of this opinion, we conclude that the court's finding of bad faith on the part of the defendant is supported by the evidence and that the defendant's claim otherwise has no merit. The record amply supports a finding of a violation of the obligation of good faith imposed pursuant to CIOA as well as the common-law duty of good faith and fair dealing implicit in every contract.

V

## DAMAGES

Last, the defendant claims that the court improperly awarded damages. We disagree.

As a general rule, the determination of damages involves a question of fact that will not be overturned on appeal unless it is clearly erroneous. *Gerber & Hurley, Inc.* v. *CCC Corp.*, 36 Conn. App. 539, 545, 651 A.2d 1302 (1995). On the basis of our review of the record, we conclude that the court's determination of damages was not clearly erroneous.

Initially, we note that at the outset of the trial, the parties stipulated that the value of the lot at the time of the breach was $1.6 million. The price of the lot set out in the reservation agreement was $1.2 million. The court found damages to be $400,000—an amount equal to the difference between those two figures.[28]

On appeal, the defendant claims that the plaintiff should be limited to reliance damages. It argues, essentially, that even if the reservation was a valid contract extended properly by an oral modification, the plaintiff was not entitled to the full value of the contract as damages because he had not fulfilled his contractual obligations under that agreement.[29] This argument, in

---

[28] The court stated, in its December 27, 2007 memorandum of decision, that the parties stipulated to damages in the amount of $400,000—$390,000 plus the plaintiff's $10,000 deposit. On appeal, the defendant claims that the parties stipulated to the value of the property and not to the amount of damages. We conclude that the court's determination of damages, based on the difference in the value of the lot and the reserved price, was not clearly erroneous; therefore, we need not address this claim. This is so because even if we assume arguendo that the defendant is correct, we may affirm the correct result of the court even though it may have been founded on an improper reason. See *Kalas* v. *Cook*, 70 Conn. App. 477, 485, 800 A.2d 553 (2002).

[29] The defendant asserts that the plaintiff still had to submit landscape plans, have his design plan approved, negotiate the terms of a purchase and sale agreement and successfully complete the closing on the property in order to fulfill his obligations under the agreement.

essence, maintains that the defendant's actions did not amount to a breach, but, rather, the plaintiff, by not fulfilling his obligations, effectively rescinded the contract. See *Winchester* v. *McCue*, 91 Conn. App. 721, 733, 882 A.2d 143 ("[A] lawful rescission of an agreement puts an end to it for all purposes, not only to preclude the recovery of the contract price, but also to prevent the recovery of damages for breach of the contract. An election to rescind a contract waives the right to sue upon it. After rescission for a breach, there is no right to sue on the contract for damages for such breach."), cert. denied, 276 Conn. 922, 888 A.2d 91 (2005).

In part I A of this opinion, we concluded that the reservation agreement was an option contract under which the plaintiff had the option of purchasing the lot for the set price by complying with the conditions of the reservation agreement. As a result, we conclude that the defendant breached that contract when it raised the reserved price for the lot, which relieved the plaintiff of performing his obligations under the agreement. See *Shah* v. *Cover-It, Inc.*, 86 Conn. App. 71, 75, 859 A.2d 959 (2004) (general rule of contract law that total breach of contract by one party relieves injured party of any further duty to perform further obligations under contract). Moreover, "[t]he general rule of damages in a breach of contract action is that the award should place the injured party in the same position as he would have been in had the contract been performed. . . . *Damages for breach of contract are to be determined as of the time of the occurrence of the breach.*" (Citations omitted; emphasis added; internal quotation marks omitted.) *O'Hara* v. *State*, 218 Conn. 628, 642, 590 A.2d 948 (1991); see also *Robert Lawrence Associates, Inc.* v. *Del Vecchio*, 178 Conn. 1, 22, 420 A.2d 1142 (1979) (measure of damages for breach of option is difference in value between purchase price recited in option agreement and actual value of option subject). As a

result, we conclude that the court's determination that damages were equal to the difference between the stipulated value of the lot on the date of the breach and the reserved price was not clearly erroneous.

The judgment is vacated only as to the third count of the second amended complaint alleging promissory estoppel. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.